[No. 28125. *En Banc.* July 30, 1943.]

WOOL GROWERS SERVICE CORPORATION, *Respondent,* v.
SIMCOE SHEEP COMPANY *et al., Appellants,* ELLIS
RAGAN *et al., Respondents.*[1]

[1]Reported in 140 P. (2d) 512.

*Hubbert & Mullins,* for appellants.

*Bonsted & Nichoson* and *F. C. Palmer, Jr.,* for respondents Ragan *et al.*

*Richards, Conklin & Delle,* for respondents Wool Growers Service Corp. and Dale Simmons.

*Cheney & Hutcheson, Dana E. Brinck,* and *J. Webster Hancox,* for respondent Federal Intermediate Credit Bank.

ROBINSON, J.—This action was on trial for approximately two months. The clerk's transcript is 477 pages in length. The appellants' abstract of record alone runs to 1457 pages; the respondents' supplemental abstract to 98; and there are more than four hundred numbered exhibits, of which some are voluminous books of account and others, thick bundles

of checks and papers. An opinion containing an adequate discussion of the evidence would preempt the greater portion of an entire volume of our reports. Under the circumstances, only an outline of the case can be given, leading to conclusions which may, in some instances, appear quite abrupt and without sufficient evidentiary support.

The principal characters involved are as follows: Wool Growers Service Corporation, engaged at Yakima in the business of lending money to sheep operators; J. F. Sears and Dale Simmons, its president and secretary; Ragan and Dunnett, copartners, large sheep operators in the Yakima district; Polonio Allarbe, an uneducated Spaniard, unable to read. English or write it, except to sign his name; Simcoe Sheep Company, a corporation, organized by Ellis Ragan, Allarbe, and Severiano Galanena, another uneducated Spaniard, who could neither read nor write English; and Federal Intermediate Credit Bank, a corporation organized under the agricultural credit act of 1923, with an office at Spokane, which had for many years extended credit to Wool Growers on notes and mortgages assigned to it representing loans made by Wool Growers to its customers.

The action, as finally pleaded, was brought to foreclose three mortgages held by Wool Growers on all of the sheep and equipment of Simcoe. Allarbe and Simcoe filed a cross-complaint against Ragan & Dunnett and Wool Growers, Simmons, and Federal Intermediate Credit Bank, alleging that these cross-defendants entered into a conspiracy to cheat and defraud them of large sums of money, praying an accounting and judgment for $37,000. Cross-defendants filed an answer denying the charges of fraud and setting up as affirmative defenses a settlement agreement signed by Allarbe and Simcoe.

At the conclusion of the evidence offered by cross-complainants, the trial court sustained a challenge to

the sufficiency of the evidence to present a case against Federal Intermediate Credit Bank. At the conclusion of all of the evidence, the court announced its decision that the evidence did not establish fraud in the procurement of the settlement agreement, and thereafter judgment was entered in favor of Wool Growers against Simcoe for various amounts, totaling a sum in excess of $21,000, and decreeing foreclosure of the mortgages. Pending the suit, the sheep were sold by a receiver under order of court, and the net proceeds, $4,125.46, were applied on the judgment, leaving a balance owing by Simcoe of $17,153.21.

September 18, 1930, Ragan & Dunnett, Allarbe, and Galanena entered into some kind of an understanding or oral agreement to engage in the sheep business by purchasing Oregon lambs, and possibly the Kays' outfit hereinafter referred to, Ragan & Dunnett to have a one-third interest, Galanena, a one-third interest, and Allarbe, a one-third interest in the business. The circumstances surrounding the making of this agreement were as follows:

In the summer of 1930, Ragan & Dunnett owed Wool Growers $65,000 on a note and mortgage which Wool Growers had indorsed and transferred to the Federal Intermediate Credit Bank. They owed the First National Bank of Yakima $65,000. They had entered into contracts with a firm in Oregon for the purchase of seven thousand lambs. They owed other obligations and were without funds to pay them.

Kays, owners of a band of sheep, owed Wool Growers approximately $32,000 on a note and mortgage indorsed and transferred to Federal Intermediate Credit Bank. It appears that they owed Wool Growers a further amount on a note and mortgage which had not been transferred to the bank. They owed the government $20,000 in back range fees, of which Wool Growers had guaranteed payment of a part. The Kays' loan was in a very unsatisfactory state.

Olney, owner of a band of sheep, owed Wool Growers approximately $12,000 on a note and mortgage indorsed and transferred to Federal Intermediate Credit Bank. He owed the government $5,300 in back range fees. Ragan and wife were sureties on Olney's bond for payment of the range fees. This loan was in a very unsatisfactory condition, and Federal Intermediate Credit Bank had notified Wool Growers that it would not be renewed in the fall.

Allarbe had approximately $47,000 in cash, which he had obtained in a settlement with a former partner, Sanchez. Ragan knew that Allarbe had this amount, having been called in by Freece, Allarbe's attorney, to advise Allarbe whether or not he should accept the settlement.

Sears, president of Wool Growers, told Ragan that the Kays' sheep would be for sale. Ragan imparted this information to Galanena and sent him to see Allarbe, who was herding sheep for Coffin Bros., south of Wapato. Later, Ragan and Galanena went to Wapato and proposed to Allarbe that the three of them purchase the Kays' outfit.

The sheep business was not in a prosperous condition. We quote from a letter received by Sears, president of Wool Growers, from Buel of Evans, Snider, Buel Commission Company of Chicago, dated August 27, 1930, reporting on the sale of a shipment of Kays' lambs:

"Mr. Sears, with these heavy supplies and a limited demand, prices for lambs are very discouraging to the owner and at this time it hardly looks like the wool and lambs that the sheep man sells will pay running expenses this year. All the middle states have lots of sheep and while last year they were increasing their holdings today they are decreasing them and the low prices do not stop their shipping too many to market. Poor crops and tight money markets are going to cause these feeding lambs to sell very low the latter part of September and October and it does

not look advisable to hold lambs back that are expected to come to market this fall."

On September 18, 1930, Ragan learned that Allarbe was in Yakima and telephoned Rodrick, a Spanish friend of Allarbe's, and had him bring Allarbe and Galanena to his house. Here, at Ragan's house, Allarbe agreed to put up $15,000 for the purchase of Oregon lambs.

On the same day, September 18, 1930, Ragan, Galanena, and Allarbe went to the First National Bank of Yakima where Allarbe kept his money, and Allarbe signed a check for $15,000, prepared by an officer of the bank, payable to Ragan & Dunnett, which Ragan immediately deposited in the bank account of Ragan & Dunnett. The balance in Ragan & Dunnett's bank account immediately after the deposit of this check was $16,028.12. On September 22, 1930, it was $2,736.44. Ragan used the money given him to purchase Oregon lambs and to pay obligations owing by Ragan & Dunnett.

On the same day, Ragan, Galanena, and Allarbe went to White Swan to look at some Oregon lambs which had been delivered at that point for Ragan & Dunnett, but which had not been paid for. A few days later, Ragan, Galanena, and Allarbe went to Oregon to take delivery of more Oregon lambs. Ragan testified that this trip to Oregon was made September 27, 1930, and produced a little black book in which he had made memoranda of the date, number, weight, and price of the lambs, which price, according to these memoranda, was five, six, and seven cents per pound.

Sometime later, Ragan, Galanena, and Allarbe drove to the mountains to look at the Kays' sheep. Ragan remained in his car beside a river at the foot of the mountain while the two Spaniards went up the trail in search of the sheep. When they returned, according to Ragan's testimony, they were well pleased with

the sheep and agreed to their purchase. Ragan never saw the sheep until they were delivered to him for the joint enterprise sometime later in October.

On October 13, 1930, Allarbe gave Ragan a check for $22,900, which Ragan immediately deposited in the bank account of Ragan & Dunnett. The balance in Ragan & Dunnett's bank account, immediately prior to the deposit of this check, was $44.10. On November 10, 1930, it was $16.37. Ragan used all of this money given him to purchase sheep, except $5,000 which he gave to Wool Growers, as hereinafter stated, to pay obligations owing by Ragan & Dunnett.

On October 14, 1930, Ragan, Galanena, and Allarbe met Sears, president of Wool Growers, at Wool Growers' office, and Sears prepared a letter addressed to them in which he agreed to sell them the Kays' sheep, consisting of about 3,500 ewes, at a price of $11.50 a head, and also to convey to them the Kays' range permit and the equipment, and acknowledged receipt of $5,000, a check for which amount was given him by Ragan. Ragan testified that the letter was read to Allarbe and Galanena, and a copy delivered to each of them, but they denied this. It may be assumed that the letter was read to them and that Allarbe understood that the price of the sheep was $11.50 a head, although that is hotly disputed.

On November 13, 1930, Ragan & Dunnett gave Wool Growers a check for $25,000, marked "Kays' sheep." This was not the money given them by Allarbe. That money had already been spent. This money was part of a loan of $35,000 obtained from the First National Bank of Yakima, or National Bank of Commerce, which $35,000 was deposited in their bank account on November 13, 1930. It is interesting at this point to notice a letter written by Sears, president of Wool Growers, to the cashier of First National Bank of Yakima, November 5, 1930, recommending the granting of this loan:

"This company is now carrying Ragan and Dunnett for $65,000 and if our capital were sufficient we would be happy to carry the entire load but our capital will not permit us to loan a greater sum to one firm or individual than $65,000. As you know, the firm of Ragan & Dunnett is one of the most substantial sheep firms we have and conducts its business on very conservative and business like lines. I am sure you can recommend them to the National Bank of Commerce as highly as ourselves. It may be necessary to ask for a renewal of this note at its maturity for ninety days as it will be paid from the proceeds of the lamb sales next season. We assure you now that we will be very happy to carry and continue to carry our $65,000 and permit the liquidation of this $35,000 note from the first returns from the lamb sales."

(The $65,000 loan was not carried by Wool Growers, but by the Federal Intermediate Credit Bank, and Wool Growers, apparently, had no authority to permit liquidation of the note from the first returns from lamb sales. The $35,000 note was, apparently, paid out of the proceeds of a $100,000 note and mortgage executed by Ragan & Dunnett to Wool Growers and which Wool Growers, in April, 1931, negotiated to Federal Intermediate Credit Bank in renewal of the $65,000 note and mortgage and for additional advances.)

On October 16, 1930, the Kays' sheep and equipment were delivered to Ragan, who caused them to be taken to Scotty Highfill's range, where they were placed on pasture.

On October 21, 1930, Galanena, to whom Ragan & Dunnett owed $6,000 in back wages, gave Ragan $3,000, which he borrowed from his cousin, Martin Galanena, also an employee of Ragan, and which was deposited in the bank account of Ragan & Dunnett.

Bernard, inspector for Wool Growers, inspected the sheep of Simcoe October 23 and 25, 1930, and made a report to Wool Growers of his inspection. The report states the number and value of the sheep as follows:

| | | | |
|---|---|---:|---:|
| 1000 | ewes (threes) | $9.00 | $9,000 |
| 2318 | ewes (fours) | 8.00 | 18,544 |
| 2100 | 1930 lambs | 5.00 | 10,500 |
| 1450 | 1930 wether lambs | 4.00 | 6,160 |
| 42 | bucks | 10.00 | 420 |

$44,624

(In this report, Simcoe is referred to as a corporation. Ragan testified that it was not until November 13, 1930, that they discussed plans to incorporate.)

The report states that the stock was purchased from parties in Oregon and Kays, and that the price paid for the Kays' sheep was $11.50 a head, and for the lambs bought in Oregon, from $5.50 to ten cents per pound. (We may note here that counsel for Ragan state that the lambs secured in Oregon for the joint enterprise were not lambs that had been contracted for by Ragan & Dunnett prior to the agreement to engage in the joint enterprise, and that the price paid for them was five, six, and seven cents per pound.) They state in their brief (pp. 72 and 73):

"These lambs, it must be recalled [the lambs contracted for prior to the agreement to engage in the joint enterprise], were purchased by Ragan under contracts made in May and June of 1930, and provided for a purchase price of 9½ to 10¢ per lb. Ex. RE-177, Ragan's pocket book, together with the cancelled checks referred to as exhibits above, clearly discloses that the Simcoe Sheep Company's Oregon lambs were purchased at prices ranging from 5¢ to 7¢ per lb. It is perfectly obvious that it would have been a breach of trust relationship if in fact any such relationship existed, for Ragan to have compelled Simcoe Sheep Company to pay 9½ and 10¢ per lb. for Oregon lambs when lambs were selling on the market for 5, 6 and 7¢ per pound. Instead of showing bad faith in the purchase of the Oregon lambs, the good faith of Ragan is definitely established by the documentary evidence above referred to."

The inspector's report, above referred to, but not quoted in full, which is also documentary evidence, does not bear out this assertion.

On November 21, 1930, Ragan, Dunnett, Galanena, and Allarbe signed articles of incorporation of Simcoe Sheep Company. The articles provide that the capital stock shall be $60,000, divided into 600 shares of the par value of $100 a share. A subscription to the capital stock was signed. Ragan subscribed for 100 shares, Dunnett, 100 shares, Galanena, 200 shares, and Allarbe, 200 shares.

On November 28, 1930, Ragan, Dunnett, Galanena, and Allarbe, the incorporators and trustees of the company, met at the office of Richards, Conklin & Delle to hold their first meeting. By-laws were adopted. Ragan was elected president, Galanena, vice-president, Dunnett, secretary, and Allarbe, treasurer. Ragan was appointed manager of the company

"With all the powers vested in a general manager as set forth in the by-laws of the corporation, with right and authority to borrow money in the name of the corporation as may be necessary for carrying on its business and authority to sign notes, checks and drafts in the name and on behalf of the corporation, make the bank deposits and perform any other functions and do all things necessary for the promotion of the success of the business."

The minutes recite that the matter of payment of the stock subscriptions was taken up, and it appearing that Ragan, Dunnett, Galanena, and Allarbe

"Have purchased and have on hand
"3631 head of lambs
"3340 head of ewes
"    40 bucks
pack horses, wagons, camp outfit and all equipment necessary for the running and caring for said sheep and lambs and carrying on the business connected therewith, and that said sheep and outfit have cost said parties the sum of $60,000, which amount they have actually paid therefor, and which is the present rea-

sonable market value thereof, and that they will turn over to the corporation said property in payment of subscriptions to the capital stock as above made, and the trustees deem it for the best interests of the corporation to accept the proposition, and being satisfied that the property to be turned into the corporation is worth the par value of the stock subscribed by the parties, and is a full consideration therefor, it was moved, seconded and carried by the unanimous vote of all the trustees that the corporation accept the property above enumerated in full payment of the subscriptions to the capital stock heretofore made by Ellis Ragan, Alex Dunnett, Severiana Galanena and Polonio Allarbe and that upon the transfer to the corporation by good and sufficient bill of sale of said property that said parties be credited with full payment of their capital stock, and that said stock be issued to them as fully paid and nonassessable and certificates representing said stock be made and delivered to each of said parties to the amount of his subscription thereto."

(It may be noticed here that the property turned in to the corporation in payment of the stock subscriptions had not cost the parties $60,000, but only $45,900, $42,900 of which amount had been contributed by Allarbe and $3,000 by Galanena. Ragan testified that, prior to incorporation, he had expended for feed $9,500, and that it was agreed that he should receive $4,600 for services performed by him, but this testimony seems to be refuted, or at least not sustained, by the books.)

At this meeting, Ragan & Dunnett, the copartnership, Galanena, and Allarbe signed an instrument called a "pooling agreement," which, however, is not referred to in the minutes. This agreement is too long to incorporate here. It recites that a corporation has been organized under the name of Simcoe Sheep Company, with a capital stock of $60,000, divided into 600 shares of the par value of $100 each, that each of the parties has subscribed for 200 shares, that the stock has been paid for by transfer to the corporation of certain

personal property, and that the property turned in to the company in payment of the capital stock was purchased with money advanced by the parties, as follows:

| | |
|---|---:|
| Allarbe | $42,900 |
| Galanena | 3,000 |
| Ragan & Dunnett | 14,100 |

(It may be noticed here that this statement is untrue. Ragan & Dunnett had not advanced $14,100 which was used in the purchase of the property that was turned in to the corporation.) It then recites that the parties are to be equal owners of the stock, and that the money advanced by Allarbe over that advanced by the other parties is to be treated as a loan, i.e., Galanena owes Allarbe $17,000, and Ragan & Dunnett owe him $5,900, which indebtedness is to be paid within five years, with interest at six per cent, and secured by the stock issued to Galanena and Ragan & Dunnett, which is to be placed in the hands of a trustee. It then recites that the parties have certain plans for financing the company, that all of the stock shall be pooled and placed in the hands of a trustee, with power to vote the stock, and that Wool Growers shall be the trustee. The agreement then provides that, if, within five years, Galanena shall pay Allarbe $17,000, the 200 shares subscribed for by him shall be his, and, if Ragan & Dunnett shall pay Allarbe $5,900, the 200 shares of stock subscribed for by them shall be theirs. The agreement provides that each stockholder appoints Wool Growers his irrevocable proxy to vote the stock during the life of the agreement; that, in voting the stock, the proxy shall exercise its best judgment for the selection of suitable trustees and officers, to the end that the affairs of the corporation shall be properly managed, and that the trustee shall incur no responsibility for any error of law or any matter or thing done or omitted under the agreement, except its own individual malfeasance. It

finally provides that no transfer of the stock owned by Galanena and Ragan & Dunnett shall in any wise affect the lien of Allarbe thereon as security for the money due him, nor release the trustee from its duty to hold said stock as such security. At the bottom is an agreement, signed by Wool Growers, accepting the trust and undertaking to perform the trust in accordance with the terms of the agreement.

Mr. Richards testified that at this meeting he was unable to understand Allarbe, and Allarbe was unable to understand him, and he suggested that Allarbe call in an attorney. Rodrick, a truck driver friend of Allarbe, a Spaniard who could read and speak English, was called in to act as interpreter. Richards testified that the pooling agreement was carefully read and explained, and that Allarbe signed it of his own free will and accord. Galanena also testified that "the contract" was read at the meeting. Allarbe denied that it was read or explained to him.

The minutes recite that a resolution to borrow $30,-000 from Wool Growers was adopted at this meeting and set forth a copy of the resolution authorizing the president and secretary to borrow from Wool Growers $30,000 and to secure the same by mortgage upon all of the property of the company, and from time to time renew the loan and to borrow from Wool Growers or from any other party, an additional sum not exceeding $20,000, and to secure the same by mortgage of all of the property of the company. The last page of the minutes containing this resolution is written in smaller type than the rest of the minutes. Mr. Richards testified that it was not prepared in his office, but probably sometime later in the office of Wool Growers. Galanena, Allarbe, and Rodrick deny that any resolution to borrow money was discussed or adopted at the meeting.

Simcoe, by Ragan president and Dunnett secretary, executed a note and mortgage to Wool Growers, dated

November 28, 1930, payable May 28, 1931. The note is indorsed by all of the stockholders, including Allarbe. December 1, 1930, Wool Growers transmitted the note and mortgage to Federal Intermediate Credit Bank, with a letter stating:

"We are enclosing papers for loan of $30,000 to Simcoe Sheep Company, secured by a first mortgage on their sheep and feed. This is the company that bought the Kays sheep and from the proceeds of the loan you are to deduct the amount due on the Kays note discounted with you."

The records of the bank disclose that this loan was authorized by the executive committee of the bank November 21, 1930. The bank applied $18,144.50 of the proceeds of its loan in payment of the balance due on the Kays' note and remitted the balance of $11,855.50 to Wool Growers. Wool Growers also transmitted to the bank a copy of a resolution purporting to have been adopted at the meeting of November 28, 1930, certified by Dunnett, secretary, authorizing the loan. There is a discrepancy between this copy and the copy appearing in the minute book, in that the copy sent to the bank recites:

"Whereas, it is deemed advisable for this corporation to borrow money for the purpose of paying current indebtedness, defraying the operating expenses and carrying on the sheep business of Simcoe Sheep Company."

The copy inserted in the minutes omits the words "paying current indebtedness." The copy sent to the bank is upon a printed form, with the words above quoted filled in with a typewriter, and it is possible that it was prepared first and the stenographer, when copying it into the minutes, omitted the words "paying current indebtedness."

Wool Growers also transmitted to the bank a statement prepared by Simmons, secretary of Wool Growers, of the financial condition of Simcoe on November

22, 1930. This statement lists the assets of the corporation as follows:

| | |
|---|---|
| Cash on hand and in bank | $27,000 |
| Hay | 1,500 |
| Corn | 1,340 |
| Livestock | 63,140 |
| Equipment | 1,500 |
| Total | 95,980 |

And the liabilities:

| | |
|---|---|
| Wool Growers | $33,760 |
| Hay | 1,500 |
| Corn | 1,340 |
| Total | 36,600 |
| Net worth | $59,380 |

(It may be observed here that this statement is not correct, in that the company did not have on hand and in the bank $27,000—it had no bank account at all until October 11, 1932—and neither the cost nor the value of the livestock was $63,140, and the company did not owe Wool Growers at that time $33,760, or any other sum, unless it was a balance due on the purchase of the Kays' sheep of approximately $8,000.)

On December 3, 1930, Wool Growers entered upon its books application of the proceeds of the loan to Simcoe, as follows:

"Purchase of Kays sheep.....$38,760
Less amount paid in cash.... 30,000     $ 8,760
Due from Ragan & Dunnett,
    interest on $65,000 loan....          4,137.11
                                         17,102.89
                                         _____
                                        $30,000.00"

And on December 3, 1930, it issued its check for $17,102.89, in favor of Simcoe Sheep Company, which check was deposited on December 3, 1930, in Ragan & Dunnett's bank account. Simmons, secretary of Wool Growers, testified that he applied $4,137.11 of

the proceeds of the $30,000 loan to Simcoe on Ragan & Dunnett's note to it for $65,000, because Ragan told him to do so. The application was not made inadvertently, as respondents claim in their briefs.

The balance in Ragan & Dunnett's bank account on December 3, 1930, immediately prior to the deposit of the $17,102.89 check, was $699.59. On December 5, 1930, Ragan & Dunnett used $13,500 of the $17,102.89 proceeds of the loan to Simcoe to pay an obligation owing by them to Guaranty Trust Company. (There is some intimation in the testimony that this obligation was for the purchase of Oregon lambs. If so, the lambs were not turned in to the corporation.)

As above stated, Olney owed Wool Growers approximately $12,000, and the government, $5,300 in back range fees. Ragan and wife were sureties on Olney's bond for payment of the back range fees. On December 6, 1930, Sears, president of Wool Growers, wrote a letter to the bank, stating:

"We are submitting a renewal of the Philip A. Olney loan in the amount of $10,000.00, the proceeds of which will be used to take up his note discounted with you and a note to us for additional money we have advanced to him. . . . It was our plan originally to sell this layout to the Simcoe Sheep Company but they are not inclined to make the purchase now. However, they told us they would be interested in purchasing these sheep next spring or summer. Our idea is to renew the loan secured by a mortgage on all of his sheep, feed and 1931 crops, and if we are unable to make a sale of the sheep in the spring we shall require Mr. Olney to pay all of the proceeds of his lamb sales to us and to make a sale of these ewes regardless of the prices."

In response to this letter, the bank, December 9, 1930, wrote a letter to Wool Growers, stating:

"The financial statement supporting this loan is of little value, yet comparing this statement with his statement of last year we find that he has had a decrease in his net worth of approximately $15,000 due largely

to the depression in livestock prices. The borrower is an Indian and may not be considered reliable, or as being a good risk. This loan was discussed with you at the time of my recent examination of your company and it was your thought that if our bank would be willing to purchase the renewal for the amount offered, you would be in a position to liquidate this loan during the coming year. It appears that Ragan & Dunnett, large sheep operators, feel that Mr. Olney's range rights would prove an attractive addition to their present holdings and that they have indicated to you that they may take over this layout in the spring. I trust that this arrangement can be carried out by your corporation. In discounting this loan we feel that we are not following policies which are consistent with good credits, but have given our consideration to the loan with the thought of being of service to your corporation in granting this accommodation. As we view it, we should not be called upon to make any additional advances to this borrower and we know that you will give this loan your very close supervision. In the event that your suggested plans in working out this proposition with Ragan & Dunnett should fail to materialize, we believe that you should take steps to liquidate this loan during the coming year as we do not consider financing this type of paper as being of material service to the industry."

On December 10, 1930, Sears wrote the bank, as follows:

"Your understanding with reference to our plans in handling the above loan is correct. We will not call on you for any additional funds in connection with this loan, but, as stated in the letter submitting the loan, we will have to use the wool money. I feel sure we have handled it in the proper way for the time being and I also feel sure we can make disposition of this property next summer and in a way which will be satisfactory to all parties."

On July 7, 1931, Olney transferred possession of the sheep to Ragan. Olney testified that he did not know to whom he was selling the sheep. There was no written transfer, although there is in evidence a written draft of a formal agreement between Olney, Simcoe,

and Wool Growers, which, however, is not signed by any of the parties. (PE-68.) This draft provides that Wool Growers accepts Simcoe in place of Olney as owner of the sheep. Simcoe assumes and agrees to pay all sums due and owing on the range permits, and agrees to save and protect Olney and his bondsmen (Ragan and wife) harmless from any and all sums. The understanding between Olney and Wool Growers was that Wool Growers would release him from his obligation to pay the loan, and would pay the back range fees of $5,300. On July 8, 1931, Sears wrote a letter to the bank, stating:

"I just returned last night from a trip in the hills where I spent some time looking over the Olney sheep and getting them to a corral where they could be counted. I had Mr. Ellis Ragan with me and I believe we have made a deal with the Simcoe Sheep Company for the Olney outfit, although there are a few details to be worked out yet. On account of the range permit, which does not expire until November 1st, I believe, it may be necessary for us to work out a plan whereby the Simcoe Sheep Company will take over the Olney sheep and agree to pay the obligation of Olney. In my opinion this will be a very fine solution of this problem. I hope to be able to write to you shortly that a satisfactory deal has been completed and I feel reasonably certain now that it will go through."

Simcoe funds were used by Ragan and Wool Growers to pay this mortgage and the back range fees. On September 4, 1931, Wool Growers sent the bank a check for $10,296.99, the balance due on the Olney note held by the bank, and in November, 1931, used $2,462.91 of Simcoe funds to pay the balance due it from Olney. Very shortly after the Olney sheep were transferred to Ragan, most of them were sold, and there is reason to think that the proceeds were applied by Wool Growers on Ragan & Dunnett's account. Ragan testified that he spoke to Allarbe about the purchase of the Olney sheep in June, 1931, at Bull Canyon, and that Allarbe told him to go ahead and purchase the

sheep. He admits, however, that he did not mention to him anything about the back range fees or the fact that he was liable on Olney's bond. Simmons, secretary of Wool Growers, in a letter, October 29, 1931, requesting release of certain proceeds from the lien of the mortgage, makes the following comments upon the Olney transaction:

"They need the proceeds of this sale to use in the operation of their business and inasmuch as it is a workout proposition and no doubt avoided a loss to us from the Olney loan, we hope you will consent to the release as outlined and permit them to use this money for operating expenses. We naturally feel under some obligation to them for the service they have performed for us. *While it may appear that they paid more than the sheep are worth, they obtained some very valuable range rights with the purchase which was the incentive for them to go into the transaction.*" (Italics ours.)

The Olney range permit was taken out in the name of Ragan, and he, at the time of the settlement hereinafter referred to, refused to transfer it to Simcoe. Ragan testified that Ragan & Dunnett sheep were not ranged on the Olney range at any time during 1931, 1932, and 1933, but there seems to be some question about that.

On June 1, 1931, Simcoe, by Ragan president and Dunnett secretary, executed a note and mortgage to Wool Growers for $35,000. This note and mortgage were transmitted by Wool Growers to the bank, with a letter stating:

"We are enclosing the papers for a loan of $35,000 to the Simcoe Sheep Company, the proceeds to be used to take up their note discounted with you and give them approximately $4,000 additional money to be used for operating expenses. Their financial statement indicates a loss which is in the valuation of their inventory and not from operation, consequently we believe that after the lambs are marketed their financial statement should show up better. We happen to

know that they have paid some range leases in advance. *We are especially anxious to serve these people now as we are negotiating with them for a sale of the Phillip Olney outfit and we feel reasonably certain it will be consummated within a short time."* (Italics ours.)

No meeting of the stockholders or trustees of Simcoe was held between November 28, 1930, and December 21, 1932. The authorization for the execution of this note and mortgage is that contained in the resolution of November 28, 1930, authorizing the president and secretary to renew the $30,000 loan from time to time and to borrow an additional amount not exceeding $20,000. The note is indorsed on the back by all of the stockholders, including Allarbe. The evidence does not disclose when or where or the circumstances under which Allarbe indorsed this note. Dunnett testified that he obtained the signature of Allarbe on papers two or three different times, or maybe more, and, on these occasions preceding the signing by Polonio, they would have a conversation in which he would tell him what the note was for.

On November 10, 1931, Simcoe, by Ragan president and Dunnett secretary, executed a note and mortgage to Wool Growers for $33,600, which, on November 25, 1931, were transmitted to Federal Intermediate Credit Bank, with a letter stating:

"The proceeds of the loan are to be used to take up their note discounted with you, the balance of which is $30,000, together with interest and a note of $2,462.91 due us, which is the balance due on the cleanup of the Phillip A. Olney account."

On December 21, 1932, Simcoe, by Ragan president and Dunnett secretary, executed a note and mortgage to Wool Growers for $47,365. (The face amount of the note is $50,000, but there is an indorsement on the note reducing the amount to $47,365.) In the minute book appear minutes of a meeting held December 21, 1932, authorizing the loan and a waiver signed by Allarbe of

notice of the time, place, and purpose of the meeting and consent that it might be held December 21, 1932. The note is indorsed by all of the stockholders, including Allarbe. It is claimed by respondents that Seijas, a Seattle attorney of Spanish descent, whom Allarbe had employed some months before, also attended the meeting. Respondents attempted to prove at the trial that the note was indorsed by Allarbe at this meeting. Ragan testified that he recalled the meeting, that Seijas and Allarbe were present, and that the note for $50,000 was indorsed by Allarbe at that meeting. He testified that, at first, Polonio let on that he did not want to indorse the note, but he and Seijas went out of the room, and then he indorsed it. It is also stated in Wool Growers' brief that this note was indorsed by Allarbe at this meeting. Seijas was not a witness at the trial. The correspondence file introduced in evidence shows conclusively that Allarbe did not indorse the note at this meeting. On December 24, 1932, Sears, president of Wool Growers, wrote a letter to Seijas at Seattle, stating:

"We cannot complete the renewal of the Simcoe loan until we have Polonio Allarbe's indorsement on the note. We wrote for a copy of the note [here he is referring to the previous note of $35,000] as I told you I would do but we did not receive it this morning. However, you may rest assured we do have the note and that Polonio's indorsement is on it. As I told you in conversation, notes for corporate loans must bear the indorsement of each stockholder on the back. This rule is followed by us without exception. Therefore, I would appreciate it very much if you would advise Polonio to come to our office immediately and indorse the note so we may send it in. Unless this loan gets on the books of the Spokane bank and our books previous to January first it will stand in bad repute and you know in these times that would be a very dangerous situation for a creditor to get into. We believe you understand our position sufficiently to know that our requirements must be lived up to with reasonable accuracy. Therefore, please notify Polonio to call and

indorse the note so that the renewal may be forwarded to Spokane for their consideration."

On December 27, 1932, Wool Growers sent Seijas the following telegram:

"Papers asking for renewal of Simcoe loan finished except Polonio's signature. Stop. Received copy of note today from Spokane bank mailing it to you today. Stop. Necessary for Polonio's signature immediately to give time for consideration of renewal before January first. Please wire immediately what you have done."

On December 28, 1932, Seijas wrote the following letter to Wool Growers:

"I have today ordered Polonio Allarbe to drop into the office and sign the new note."

On December 30, 1932, the note and mortgage were transmitted by Wool Growers to Federal Intermediate Credit Bank, with a letter stating that the proceeds were to be used to take up the note of November 10, 1931, on which there was a balance unpaid of $31,386.91, and for further advances, and further stating:

"We were very particular that the Simcoe Sheep Company fulfilled all necessary legal requirements in connection with our loan as two of the stockholders are Spaniards who do not understand these matters. Therefore, under the supervision of our attorneys, a stockholders' meeting of the Simcoe Sheep Company was held and the loan approved as indicated by the enclosed resolution. This was done rather hurriedly as we were not able to get all the stockholders together until late one evening and the two Spaniards are now in the hills with the sheep and to again bring them in would be a difficult matter. Therefore, we hope that the loan will be acceptable in the present form. . . . By asking you to increase the loan from $32,978.63 to $47,365.00 we are making quite a heavy demand on you, especially in view of the fact that all but 2100 head of their ewes are ages 5 or older. However, the loan should not at any time exceed this amount and it will be reduced quite rapidly from the proceeds of their wool and lamb sales during the summer, and

since we cannot liquidate the loan at this time, the only thing we know to do is carry on with it and closely supervise their operations so they will be able to operate well within the budget and obtain maximum production from their sheep. They have very good range permits and we believe they will make a much better showing this year than last on account of better weather conditions and the fact that they are better organized and more determined to operate successfully."

(Galanena, apparently, did not attend this meeting. The minutes of the stockholders' meeting, reducing the number of trustees from four to three, which was held on the same day, recite that Galanena was present by his power of attorney and proxy to Ellis Ragan. Galanena had previously resigned as an officer and trustee of the company, and, on December 13, 1932, gave Ragan an irrevocable power of attorney to represent him in all matters until the last day of December, 1937. Apparently, the two Spaniards were out in the hills with the sheep.)

Transmitted with the papers to the bank was also a statement of the financial condition of Simcoe which showed, under "Accounts Receivable," an item of $30,736.46 owing by Ragan & Dunnett to Simcoe. On January 3, 1933, the bank wrote a letter to Wool Growers referring to this item and stating:

"We assume that the accounts receivable item shown in the borrowers' financial statement of $30,736.46 carries little value as the amount is owing by Ragan and Dunnett personally. If, however, you believe that there is any equity in these accounts they should be assigned your corporation and this bank as additional collateral to this loan. We, of course, assume that you are securing an assignment of these borrowers' leases, which should be sent to us promptly."

On January 16, 1933, in response to a second letter from the bank with reference to the same matter, Wool Growers wrote a letter to the bank, stating:

"We do not believe the $30,736.46 accounts receivable item shown in their statement as the amount owing by Ragan and Dunnett, personally, represents sufficient value to warrant being assigned as additional collateral to the above loan."

On December 27, 1933, Simcoe, by Ragan president and Dunnett secretary, executed a note and mortgage to Wool Growers for $37,000. This is the mortgage to Wool Growers sought to be foreclosed in this action. Execution of the note and mortgage was authorized at a meeting of the trustees of the company held December 27, 1933. Allarbe refused to attend this meeting, and Ragan caused a subpoena to be served upon him by the sheriff. He attended, in response to this subpoena, with Jack Connor, a sheepherder, but did not vote or participate in the meeting. The minutes of this meeting recite that a resolution to borrow $37,000 was adopted by the unanimous vote of all the trustees present, except Polonio Allarbe not voting. It is also recited, at the end of the resolution, "The minutes were prepared before the meeting adjourned and on motion made, seconded and carried, were unanimously adopted and approved and the president and secretary authorized to sign the same." The note and mortgage were transmitted by Wool Growers to the bank, December 29, 1933, with a letter stating:

"Polonio Allarbe is an ignorant Spaniard who absolutely refuses to sign anything. We are enclosing minutes of the meeting at which a resolution was passed authorizing the loan."

(Throughout the record of these transactions, there are many references to Allarbe's ignorance and lack of business understanding. These occur mainly in letters written by Wool Growers whose officers had a much better opportunity to judge of that matter than we have or the trial judge had.)

A full copy of the minutes was transmitted to the bank. The note was indorsed by Ragan & Dunnett, but

not by Allarbe: Enclosed with the papers was a statement of the financial condition of Simcoe, showing that the loan was approximately 110 per cent of the appraised or market value of the security. The bank accepted the loan, although it was its almost invariable practice to require all corporate notes assigned to it to be indorsed by all of the stockholders of the corporation.

We will now refer to the method of bookkeeping adopted by Ragan & Dunnett and Wool Growers, and to the way the affairs of Simcoe were managed by Ragan & Dunnett. No bank account for Simcoe was opened until October 11, 1932. No books for Simcoe were opened until almost two years after the corporation was formed. This bank account and these books were opened after Attorney Hubbert had written a letter to Ragan & Dunnett demanding an inspection of the books and threatening suit. Ragan & Dunnett, on their own books, charged themselves with the entire capital stock of Simcoe; that is, they charged themselves with the $42,900 advanced by Allarbe, the $3,000 advanced by Galanena, and the $14,100 which the pooling agreement recited had been expended by them for sheep that had been turned into the corporation. As expenditures were made for Simcoe, they credited themselves accordingly. Supplies for Simcoe were purchased in the name of Ragan & Dunnett. Lambs and wool of Simcoe were commingled with lambs and wool of Ragan & Dunnett, and sold as lambs and wool of Ragan & Dunnett. The costs of supplies and the proceeds from the sale of lambs and wool were apportioned between the two companies. In 1931; Wool Growers received large sums of money, running into the tens of thousands of dollars, from the sale of lambs and wool which were released to it by Federal Intermediate Credit Bank. It kept no account with Simcoe, except its loan account. The proceeds of these sales were deposited by Wool Growers in its own

bank account, and credit therefor was entered upon its account with Ragan & Dunnett. Wool Growers itself made deposits of Simcoe funds in Ragan & Dunnett's bank account. Even after Simcoe opened its bank account, Wool Growers deposited large sums of money in Ragan & Dunnett's bank account to meet outstanding checks of Ragan & Dunnett, and reimbursed itself out of Simcoe funds upon Ragan's alleged statement that the outstanding checks had been issued for the benefit of Simcoe. It is impossible to determine from the evidence, voluminous as it is, what became of the large sums of money borrowed during 1930, 1931, 1932, and 1933 by Simcoe. Appellants endeavored to show that the proceeds of the $47,365 loan of December 21, 1932, were misappropriated by Ragan & Dunnett, but were precluded from doing so by the rulings of the court.

, In the summer of 1932, Allarbe became suspicious that all was not right with Simcoe. He saw Hubbert, an attorney at Yakima, who, in August, 1932, wrote a letter to Ragan & Dunnett demanding an inspection of Simcoe's books and threatening suit. After receiving this letter, Ragan & Dunnett drove out into the hills where Allarbe was tending the sheep and spoke to him about the matter, and, apparently, satisfied him for the time being that the corporation was being properly managed.

In October, 1932, Simcoe opened a bank account and a set of books. The entries in these books are copied from entries in Ragan & Dunnett's books and information furnished by Ragan. In the fall of 1932, Galanena became disgusted with the way affairs of the corporation were being managed and resigned as a trustee and officer of the company. December 13, 1932, he gave Ragan an irrevocable power of attorney to represent him at all meetings of the stockholders and trustees of the company, and to act as his irrevocable agent in all matters until the last day of December, 1937. The

power of attorney refers to the pooling agreement between Ragan & Dunnett, Galanena, and Allarbe, entered into November 28, 1930. A copy of this power of attorney was transmitted to the Federal Intermediate Credit Bank.

In the fall of 1932, Allarbe saw Seijas, a Spanish attorney at Seattle, and employed him to investigate the affairs of Simcoe. It is testified that he charged Ragan & Dunnett and Wool Growers with numerous misappropriations and threatened to institute suit. He received a salary of forty-five dollars a month, which he received through Wool Growers. He also received a check for $400, dated July 28, 1933, which was drawn on Simcoe's bank account, payable to Allarbe and indorsed by Allarbe. Ragan testified that Allarbe requested him to draw the check, as he wanted to get rid of Seijas, and that he gave the check to Allarbe. Allarbe denied that he had any knowledge of the issuance of the check. It seems probable at least that this check was given to Seijas by Ragan. It appears that Ragan visited Seijas at his office in Seattle. Ragan at first emphatically denied that he ever did so. He later testified that he met Seijas in the elevator, went with him to his office, and talked with him about the affairs of Simcoe. Allarbe and Connor testified that Seijas stated to them that an automobile owned by him had been given to him by Ragan, that they made complaint to the grievance committee of the bar association, and that the bar association investigated the matter. The appellants offered to prove the result of the investigation, but respondents objected, and the evidence was not admitted. Ragan denied that he gave Seijas an automobile. Seijas was not called as a witness by either party. Allarbe employed Bolin, an attorney at Toppenish, and gave him a check for forty-five dollars, which, he testified, was all the money he had at the time. Bolin obtained the assistance of Allen, an attorney at Yakima, and the two attorneys entered into an

agreement with Allarbe whereby they were to receive for their services twenty-five per cent of the amount of any recovery, and a larger amount in case of an appeal. Allen undoubtedly made as thorough an investigation as the books of Simcoe and Wool Growers permitted, and thereafter charged Ragan & Dunnett and Wool Growers with having misappropriated funds and property of Simcoe, and with most of the acts alleged in the cross-complaint. It is evident, however, that there were many things which Allen did not discover, and some others which he did not report to Allarbe. He testified that he did not report to Allarbe the fact that Simcoe funds had been deposited in Ragan & Dunnett's bank account.

In April, 1934, it was proposed by Ragan that the parties get together and try to effect a settlement of the matter. A meeting was held at Wool Growers' office. As we read the record, the evidence shows that the only meetings attended by Allarbe were the meeting of May 28, 1934, and the meeting at Allen's office of May 31, 1934. It was proposed that Ragan & Dunnett resign as officers and trustees of the company, turn over all of their stock to Allarbe, and that Allarbe cancel their note for $5,900; that Galanena transfer all of his stock to Allarbe. (It appears that Galanena, on April 6, 1934, had executed an instrument transferring all of his stock to Allarbe. The instrument, as originally prepared, named Allen and Bolin as the assignees, but their names were scratched out with a pen and the name of Allarbe inserted.) Allen insisted that Ragan transfer to Simcoe the Olney range permit, which belonged to Simcoe, but which stood in Ragan's name, but Ragan refused to do this, and the meeting broke up. Other meetings were held at which it was proposed that Wool Growers, so it is claimed, agree to finance Simcoe for the remainder of the season. Simmons, manager of Wool Growers, agreed to this, provided a competent person was placed in charge of the sheep.

Allen testified that he and Bolin sat down and figured out that, if the sheep were properly managed, there would be sufficient funds from the proceeds of the sale of lambs and wool to pay the mortgage and have the sheep left. He was so impressed with this proposal that he agreed to recommend its acceptance by Allarbe, and that Ragan be permitted to retain the Olney range permit.

A meeting, at which Allarbe was present, was held at Wool Growers' office May 28, 1934. Richards had prepared an agreement between Ragan & Dunnett, Allarbe, Galanena, and the creditors. The agreement, in substance, provides that Ragan, Dunnett, and Galanena shall turn all of their stock over to Allarbe; Ragan & Dunnett shall resign as trustees and officers of the company; the pooling agreement shall be dissolved; Allarbe shall release Ragan & Dunnett and Wool Growers of all indebtedness; Simcoe shall release them from all obligations, and Allarbe shall assume liability on the unpaid stock subscriptions; and Simcoe shall execute a mortgage to Guaranty Trust Company, trustee, securing certain creditors whose claims amounted to $3,879.19. Prior to the meeting, Ragan had circulated the agreement among the creditors and obtained their signatures. Allarbe signed the agreement. Ragan & Dunnett indorsed their certificates of stock over to Allarbe and resigned as officers and trustees.

A meeting of Simcoe was held at Allen's office May 31, 1934. New officers were elected and further releases signed by Allarbe and Simcoe, a little broader in scope than the so-called creditors' agreement. Simcoe executed a mortgage to Guaranty Trust Company, trustee, for $3,879.19, payable November 1, 1934; also a mortgage to Allen and Bolin securing a note to them for $7,500 for their services. McGuffie, an employee of Ragan & Dunnett, was placed in charge of the sheep. Between August 10, 1934, and November 30, 1934,

McGuffie sold sheep and lambs, the proceeds amounting to $18,773.74, which were applied on the mortgage. Wool Growers, in compliance with its own agreement to finance Simcoe for the remainder of the season, made advances of $1,774.73 on August 13, 1934, $696.54 on September 17, 1934, and $519.86 on December 3, 1934 (the suit to foreclose was instituted December 4, 1934), to pay operating expenses. The funds for the advances of August 13, 1934, and September 17, 1934, were borrowed by Wool Growers from Federal Intermediate Credit Bank on notes executed by Simcoe. The note of December 3, 1934, for $519.86, was forwarded by Wool Growers to the bank with a request for a loan, but the loan was not granted. The mortgage matured October 27, 1934. Except for the loan of $519.86, Wool Growers refused to make further advances. Efforts were made by Allarbe and Allen to procure range leases and finances for the following season.

September 17, 1934, Allarbe assigned all of his shares in the corporation to Maud Bolin (447 shares), Reta Laup (150 shares), Charles F. Bolin (1 share), Frank J. Allen (1 share), and Stephen Rodrick (1 share), they orally agreeing that he should receive one-half of the profits. Maud Bolin, wife of Charles F. Bolin, was of Indian blood and entitled to preference rights in securing leases on the Indian reservation. On September 18, 1934, the new trustees of the corporation, Maud Bolin, Reta Laup, and Charles F. Bolin, held a meeting and adopted the following motion and resolution:

"It was moved and seconded that Maud Lillie Bolin proceed to Spokane and negotiate regarding the securing of moneys for the purpose of refinancing and continuing the corporation for the ensuing year. Likewise it was moved and seconded that she proceed to take such steps as necessary to secure the necessary range of the Yakima Indian Reservation."

"Resolved, that the president of this company be and she is hereby authorized to borrow from the Wool Growers Service Corporation or the Federal Reserve Bank, a sum of money sufficient for the re-financing

and operating, and that she purchase or secure the money to purchase 3600 head of new sheep, and that she is hereby authorized to secure the same by mortgage on any and all of the property of this company which shall be executed in the name of the company by its president."

On September 20, 1934, Simmons, secretary of Wool Growers, wrote the following letter to Federal Intermediate Credit Bank at Spokane:

"All range leases on the Yakima Indian Reservation are open for bid on September 25, 1934, and it is necessary for the Simcoe Sheep Company to bid on their ranges if they want to continue to operate there next season. The bids must be accompanied by a certified check in payment of ten per cent. of the annual range fee. In the case of the Simcoe Sheep Company the ten per cent. will amount to approximately $500.00 or $600.00. The Simcoe Sheep Company has applied to us for an advance of this amount to be used for the payment. We advised them we would take the matter into consideration and let them know in a day or two, and explained explicitly that we were making no promises whatsoever regarding additional advances. We planned to have a directors' meeting to discuss the matter, but as we were unable to get our Board together, the writer talked with Mr. Sears, T. H. Smith, Archie Prior and Mr. Anderson, and we are all of the opinion that it is to our best interests to decline the application. *We are also of the opinion that we should require payment of the loan at maturity on October 27, 1934.*

"This letter is written to you to keep you advised as to the change in the setup of their affairs and our attitude regarding it. *It has occurred to us that the stockholders may go to Spokane to see you and try to work out some arrangement for refinancing.* Our reasons for rejecting their application are that they are not experienced sheep operators, are not willing to put any money into the company to increase the margin of our security *and as far as the bidding on the ranges is concerned they will be in direct competition with many of our customers now operating on the Reservation.*"
(Italics ours.)

Allen and Mrs. Bolin started out in his car for Spo-. kane, but the car broke down. Allen called the bank by long distance telephone and made application for a loan of $600 to apply as a down payment on Mrs. Bolin's application for a lease in the Indian reservation. The loan was refused. Ranges and finances for the following year were not obtained, and thereafter all of the shares of the capital stock of the corporation were re-assigned to Allarbe. It appears that Ragan & Dunnett got the ranges on the Yakima Indian Reservation formerly held by Simcoe.

We will now note some of the facts attending institution of the suit. December 4, 1934, Wool Growers instituted suit against Simcoe to foreclose the mortgage of December 27, 1933, which had been reassigned to it by Federal Intermediate Credit Bank, and on which there remained a balance unpaid of approximately $6,000, and interest. It made Guaranty Trust Company, trustee, holder of the second mortgage, and Allen and Bolin parties defendant. Guaranty Trust Company, trustee, through its then attorneys, Cheney and Hutcheson, who now represent Federal Intermediate Credit Bank, December 18, 1934, filed an answer and cross-complaint, in which it alleged that Wool Growers misappropriated large sums of money belonging to Simcoe; that the settlement agreement was procured by fraud, and that, instead of Simcoe owing Wool Growers any money, Wool Growers was indebted to Simcoe in a sum in excess of $20,000. The cross-complaint was verified by Sylvester, the accountant who formerly kept the books of Ragan & Dunnett. Simcoe, a few days later, filed a cross-complaint containing substantially the same allegations contained in the cross-complaint of Guaranty Trust Company. Allen also filed an affidavit containing charges that Wool Growers and Ragan & Dunnett had entered into a conspiracy to cheat and defraud Simcoe. Wool Growers thereupon dismissed the suit without prejudice. The note and mortgage were re-

assigned to Federal Intermediate Credit Bank, and that bank, December 24, 1934, instituted suit to foreclose the mortgage. It made Guaranty Trust Company, trustee, and Allen and Bolin parties defendant. Guaranty Trust Company again filed a cross-complaint, verified by Sylvester, containing the same charges contained in its cross-complaint filed in the suit instituted, and later withdrawn, by Wool Growers. Thereupon Federal Intermediate Credit Bank insisted that Wool Growers maintain the suit, and reassigned the note and mortgage to Wool Growers, and Wool Growers was substituted as plaintiff in place of the bank. In the meantime, Wool Growers purchased the mortgage held by Guaranty Trust Company, trustee, at a large discount, and the $7,500 mortgage held by Allen and Bolin, paying Allen and Bolin $1,000 therefor. Thereupon, Guaranty Trust Company, trustee, and Allen and Bolin were dismissed from the suit. Wool Growers thereupon filed an amended complaint against Simcoe containing three causes of action; the first, to foreclose the $30,000 mortgage executed to it, the second, to foreclose the Guaranty Trust Company mortgage, and the third, to foreclose the mortgage to Allen and Bolin for $7,500.

The trial judge found that no conspiracy was shown. We are profoundly sensible of the fact that the trial judge had the advantage of seeing the witnesses, hearing their testimony, and observing their demeanor while on the witness stand and about the court. Among other things, he had an opportunity of observing Polonio Allarbe, which is denied to us. Much in this case depends upon Allarbe's degree of intelligence or lack of it. We realize that a man may not be able to read or write the English language, or speak or understand it very well, and yet know his way around in a business deal. But, as we have already shown, as late as December, 1933, Wool Growers, which by that time had had ample opportunity to judge of the matter, wrote a letter to the bank in which it included this significant state-

ment: "Polonio Allarbe is an ignorant Spaniard." Furthermore, Allarbe's simplicity is clearly manifested by his acts after the settlement, and, indeed, in making the settlement itself.

In certain cases, a reviewing court has an advantage over the trial court. What we have in mind was so cogently stated by Roscoe Pound, while serving as a court commissioner of the supreme court of Nebraska, that we quote from a decision written by him forty years ago:

"It must not be forgotten, however, that there are sometimes advantages on the side of the reviewing court. In long and complicated equity cases, especially where an accounting is involved, there is a marked difference between reaching a finding on one's recollection of what he has heard in the course of a trial lasting weeks or even months, and a finding as a result of patient investigation of a written record, with the aid of printed briefs, where comparisons may be made, computations tested, circumstances weighed, and conflicting statements sifted, upon the certain and assured foundation of a written page." *Faulkner v. Simms*, 68 Neb. 295, 302, 89 N. W. 171, 94 N. W. 113.

The trial judge said, among other things, in delivering his well-considered opinion:

"I do not believe that there was any deliberate or planned conspiracy between plaintiff [Wool Growers] and Sears, Simmons, Ragan and Dunnett or the bank."

Nor do we believe that there was any deliberate and planned conspiracy. Concert of action grew and developed. Ragan's firm was in desperate need of cash. He acquired more than $42,000 of Allarbe's money. Needing further financing, he got it by bailing Wool Growers out of a couple of bad loans to Kays and Olney. This was of material benefit to both Wool Growers and Ragan. Wool Growers realized in full on a bad loan. Olney's $5,300 back range fees, for which Ragan and wife were sureties, were paid, and Ragan even kept the range. Allarbe's money made these things possible.

In other transactions, Allarbe's money, and afterwards Simcoe funds and property, were, with the knowledge, and indeed with the assistance of Wool Growers, so commingled with the funds of Ragan & Dunnett that they cannot be segregated, at least under the evidence so far produced in this case. There appear to have been repeated misuses of corporate funds in which both Ragan & Dunnett and Wool Growers participated. For example, Ragan should have paid the back Olney range fees. They were discharged by the use of Simcoe's money. Wool Growers paid obligations of Ragan & Dunnett to themselves with Simcoe money. The evidence is, we think, well-nigh conclusive that Ragan sold sheep belonging to Simcoe and kept the proceeds. Supplies for both Simcoe and themselves were purchased by Ragan & Dunnett. Lambs and wool of Simcoe were commingled with lambs and wool of Ragan & Dunnett. Wool Growers itself made deposit of Simcoe funds in Ragan & Dunnett's bank account. These things were going on for nearly two years before a bank account or books were opened for Simcoe. During this period, Ragan was general manager, with the broadest possible powers, and Wool Growers, as trustee, held all its stock, except four shares, with the duty of selecting proper trustees and officers, to the end that the affairs of the corporation should be properly managed.

This case was first argued before a department of the court, and, later, *En Banc*. In each instance, a decisive majority of the judges sitting were of the opinion that Allarbe was unjustly deprived of his money by the acts of Ragan & Dunnett and Wool Growers, and they thought it of little consequence whether or not their concerted acts could be properly denominated a conspiracy. But with the crucial question in the case the court has had great difficulty: Is Allarbe estopped from demanding an accounting by the settlement hereinbefore referred to? The respondents say that, at the

time the settlement was made, Allarbe believed that Ragan, Wool Growers, their officers, and the bank were, all and sundry, absolutely unworthy of any trust and confidence whatsoever; and without doubt, considering the various charges he had been making with respect to them for the better part of two years, that Allarbe had no longer trust or confidence in Wool Growers or Ragan must be conceded. They also point out that Allarbe was represented by attorneys, and further, that these attorneys, during a period of more than a year and a half, had carried on an investigation of Allarbe's charges and had been given full right to inspect all books and records, and that that right had been quite fully exercised. Hence, they say that the parties dealt at arm's length, and that, even if it be admitted, *arguendo*, that Allarbe had any valid claims against them or any of them, they were extinguished by the settlement and release. These contentions they supplement by the familiar and well-grounded principle that the law favors the amicable settlement of disputes, and is inclined to clothe them with finality.

On the part of Ragan, it is further contended that his fiduciary relationship, if any, was of the most technical kind as a director and officer of a corporation in which Allarbe had a third interest. On the part of Wool Growers, it is said that it did not even stand in a technical fiduciary relationship to Allarbe, merely being a trustee of a voting trust. The majority of this court have come to the conclusion, however, that the situation was such that Ragan, Wool Growers, and its officers did occupy a fiduciary relation to Allarbe. Ragan got possession of his money. A corporation was ultimately formed in which Allarbe was assigned a third interest, and from the start Ragan was manager, with these all-inclusive powers:

"With all the powers vested in a general manager, as set forth in the by-laws of the corporation, with right and authority to borrow money in the name of the corporation, as may be necessary for carrying on

its business, and authority to sign notes, checks, and drafts in the name and on behalf of the corporation, make the bank deposits and perform any other functions and do all things necessary for the promotion of the success of the business."

From the very date of the organization of the corporation, Wool Growers held all of the Simcoe stock, except four shares, in a nonrevocable voting trust, charged with the duty of selecting proper and suitable officers. It may be said here, parenthetically, that it continued Ragan as director and manager long after the time it knew that he was taking undue personal advantage of his powers, and indeed assisted him in doing so, to the disadvantage of the corporation and its stockholders. The principles which govern the situation before us are elementary:

"Undoubtedly the directors of a corporation in the management of the corporate affairs occupy a position of extreme trust and confidence and exercise great power for good or bad over the corporation and its shareholders. They are agents for the corporation. Toward it and the stockholders they undoubtedly stand in a fiduciary relation as far as corporate business is concerned." 1 Bogert, Trusts and Trustees, p. 59, § 16.

(Our corporation statute provides that officers and directors shall be deemed to stand in a fiduciary relation to the corporation. Laws of 1933, chapter 185, p. 796, § 33, Rem. Rev. Stat. (Sup.), § 3803-33 [P. C. § 4592-63].)

It will be seen, by reading further in the section just quoted from Bogert, that majority stockholders occupy a fiduciary relation toward the minority stockholders. It must logically follow that a trustee of voting stock holds an even stronger fiduciary relation as to the stockholders themselves. He has been constituted their sole and irrevocable agent to select fit and proper officers for the corporation.

■■ At all events, Ragan, of Ragan & Dunnett, and Wool Growers were in complete control of Simcoe

affairs, and, therefore, complete masters of the interests of the two Spaniards, Allarbe and Galanena, and it is equally clear, from what we have already said, that they breached their trust for their own private gain. The relationships of which we have spoken, it must be remembered, continued right up to the instant of settlement. The confidential relation had ceased, but the fiduciary relation continued until the settlement became an accomplished fact.

"b. *Fiduciary relation.* A person in a fiduciary relation to another is under a duty to act for the benefit of the other as to matters within the scope of the relation. . . . If the fiduciary enters into a transaction with the other and fails to make a full disclosure of all circumstances known to him affecting the transaction, or if the transaction is unfair to the other, the transaction can be set aside by the other. (See § 170 (2) )" Restatement, Trusts, p. 7, § 2, comment (b).

"§ 170. Duty of Loyalty. . . . (2) The trustee in dealing with the beneficiary on the trustee's own account is under a duty to the beneficiary to deal fairly with him and to communicate to him all material facts in connection with the transaction which the trustee knows or should know." Restatement, Trusts, p. 431, § 170.

■ In the instant case, the fiduciaries are standing upon a release. As to this, we quote further from the Restatement, as follows:

"§ 217. Discharge of Liability by Release or Contract. "(1) A beneficiary may preclude himself from holding the trustee liable for a breach of trust by a release or contract effective to discharge the trustee's liability to him for that breach. "(2) A release or contract is not effective to discharge the trustee's liability for a breach of trust, if . . . "(e) the transaction involved a bargain with the trustee which was not fair and reasonable."

Covering somewhat the same subject, Bogert says, in volume 3, p. 1566, § 493:

"All direct business dealings between persons in a fiduciary or confidential relation are affected by the doctrine under consideration. Gifts, contracts, sales, *releases,* and mortgages are controlled by the rule." (Italics ours.)

And on the following page, under a heading, "What is Fair Play," he says, in part:

"The point generally regarded as most important in making a showing of good faith is that the fiduciary made a full and frank disclosure of all the relevant information which he had."

And, after discussing that at some length, he says, on the following page:

"Secondly, the courts place upon the fiduciary who has received an advantage in a direct transaction with his principal the burden of showing that, if the arrangement purported to be one for a consideration, the consideration was adequate."

Was there a full and frank disclosure? Due to the fact that proper books were not kept, and, indeed,, for a considerable period, no books at all, the submission of such data as Ragan and Wool Growers had to Allarbe's attorneys did not serve the purpose of a full disclosure. Mr. Allen, one of Allarbe's attorneys, who spent considerable time in examining such data as was available, discovered a considerable number of diversions, conversions, or misapplications of Allarbe's and Simcoe funds, but, as he said, he was not a bookkeeper, and, even if he had been, he could not have furnished the whole truth. Sylvester, of Sylvester & Straight, accountants, who kept the Ragan & Dunnett books, testifying in regard to a sum that was turned over to Ragan & Dunnett, and which was part of a larger sum which came partly from refunding a mortgage and partly from the sales of wool and sheep, testified as follows:

"Q. In other words, the only way you could determine the amount of money of Ragan & Dunnett that was turned over to them of this $21,240.01 would be by an

audit of your books and a report on them? A. Yes. Q. That is the only way? A. And all our accounts."

Although this matter has been investigated in a trial lasting two months, and we have before us this immense mass of oral testimony and documents, it is clear that it does not tell the whole story.

Before discussing the matter of adequacy of consideration, it may be noted that the evidence shows that Wool Growers was very active in arranging the settlement. The preliminary negotiations were held at its office. Its attorneys drafted the papers and generally supervised the negotiations and the closing of the matter. In its correspondence with the bank, Wool Growers repeatedly referred to Allarbe and Galanena as ignorant Spaniards. On May 17, 1934, when the negotiations for the settlement were pending, and, but two weeks before the settlement was made, its secretary, Simmons, in a letter to the bank, said:

"The Spaniards are not capable of handling the outfit without help of Ragan & Dunnett. They are ignorant, and Polonio cannot get along with any of the herders. Therefore, we have reached the conclusion that it will be best for all concerned if the loan is liquidated next fall."

About a month earlier (April 10), Simmons said, in a similar letter:

"We do not think it advisable to fill up their bands, as we want to liquidate the loan this season."

This was natural enough, for the reports to the executive committee of the bank show that the loan secured by the mortgage on all the property of Simcoe, and which was being increased month by month by advances to keep the flocks serviced, had gotten into a somewhat hopeless condition. We quote briefly from the reports made just shortly prior to the settlement:

"This loan is approximately 110 per cent of the appraised or market value of the security." (Report of January 2, 1934.)

"This loan is approximately 115 per cent of the appraised or market value of the security." (Report of April 10, 1934.)

"This loan is approximately 120 per cent of the appraised or market value of the security." (Report of May 18, 1934.)

Thirteen days later, Allarbe signed the releases and received two-thirds of the stock of Simcoe, a corporation, whose assets were mortgaged for more than 120 per cent of their value. He also received the oral promise of Wool Growers to finance the operation of the sheep until fall, and, as we have already seen, Wool Growers did supply approximately three thousand dollars for that purpose, but there is a letter among the exhibits which shows that it did not consider that promise binding, and the master motive for supplying this money may well have been to protect its security. The sheep had to be maintained. We have already seen that, before and during the settlement negotiations, and after their consummation, it had the fixed intention of liquidating its loan in the fall, and we have, earlier in this opinion, quoted its letter of September 20, 1934, in which it said it was making no promises to Simcoe in regard to additional advances and impliedly asked the bank not to furnish Simcoe with funds to bid for Indian range, closing with:

" . . . As far as the bidding on the ranges is concerned, they will be in direct competition with many of our customers now operating in the Reservation."

For two-thirds of the stock in the corporation, the property of which was mortgaged for upwards of 120 per cent of its value, and the oral promise, Allarbe, individually or as the future sole owner of the corporation, agreed to do the following things: He assumed any liability there might be on the unpaid stock subscriptions; canceled Ragan & Dunnett's note for $5,900; gave up the Olney range; released all indebtedness of Ragan & Dunnett to the corporation, which, we have pre-

viously seen from correspondence from Wool Growers to the bank, amounted to $30,736.46 in January, 1933, as well as all personal claims against them; released all corporate and personal claims against Wool Growers; and made a second corporate mortgage to the Guaranty Trust Company to secure certain creditors in the amount of $3,879.19. He received legal, but not equitable, consideration. To say the consideration he received for this release was inadequate would be a gross understatement. In so far as value is concerned, it was less than nothing.

In spite of all the explanations which were made to Allarbe, and we do not for a moment doubt that Mr. Conklin for the Wool Growers made a full explanation of the settlement papers, we think it quite possible, though we do not so hold, that he had no conception of what he was doing. Certainly, the comments of Mr. Allen, his own attorney, could easily have misled a person of his acknowledged ignorance, except as to the care and herding of sheep. Mr. Allen testified that, before Allarbe had agreed to the settlement, he said to him:

"Now, Polonio, understand that if this goes through, if you agree to this, then you have waived any right you may have to any claims at all through or for the benefit of the Simcoe Sheep Company, and there would be no more lawsuits. It is all settled. You won't have any—you will get your sheep back, but you won't have any claim against them."

And, after the settlement, Allen told Allarbe:

"Now, Paul, you are the boss. You have got it all. You are a good sheepherder. You look after the sheep. Now, see how good a business man you are. Now, don't forget you have got to get range and get refinanced. It is up to you to handle this thing. These people say you can't run this business. Now, you see if you can show them that you can."

Whereupon, at once, on the very day the settlement was fully consummated, May 31, 1934, Allarbe, as sole

owner of the Simcoe stock and president of the corporation, gave to Allen and Bolin for their services the corporation's note in the amount of $7,500. Allarbe executed a long and elaborate corporate chattel mortgage on all the corporate property, together with all increase and replacements thereof, to secure this note; the mortgage, however, being expressly made junior to the Wool Growers' mortgage and the Guaranty Trust Company's mortgage. The note and mortgage to Allen and Bolin, made, as aforesaid, contemporaneously with the settlement, was subsequently sold by them to Wool Growers. The foreclosure of that mortgage forms the subject matter of Wool Growers' third cause of action in this suit.

■■ In our opinion, neither Allarbe nor Simcoe is estopped by the release from demanding an accounting from Wool Growers and Ragan & Dunnett, for the reason that no full disclosure was made, and because the consideration, if what he received can be dignified by that term, was inadequate, if any. The whole transaction was so grossly unfair that it cannot be recognized as valid in equity. The trial court refused to allow amendments, offered fairly early in the trial, which would have permitted the cross-complainants to pursue the theory upon which we render this decision. This action is before us *de novo*, however, and, in the interests of justice, as we have the right to do, we have considered the cause as if the amendments had been allowed.

■ The trial court dismissed the Federal Intermediate Credit Bank, on motion, at the close of cross-complainants' evidence. It can scarcely be supposed that the officers of that institution were ignorant of the misapplication of funds belonging to Simcoe, in view of the correspondence concerning the Olney deal, as well as some other matters in the record. It appears to have knowingly profited by some of the misapplications. Yet, the bank did not, as we read the record, come into

a fiduciary relationship with the cross-complainants, and we have concluded that the action of the trial court in dismissing it should be, and it is, affirmed. On the theory upon which we rest this decision, Dale Simmons must also be dismissed, and it is so ordered.

■ We realize the difficulties which will inhere in an accounting of these matters, due principally to the failure of the cross-defendants to keep proper accounts. There is a well-established rule, however, which will make an accounting possible and partially effective at least. We find the rule well-stated, with many supporting citations, in *Backus v. Finkelstein,* 23 F. (2d) 357, as follows:

"The persistent failure to keep accurate books of account, and to preserve important records, alone places defendants in an almost hopeless position. In dealing with the property and rights of others, the necessity for keeping such accounts and of preserving such records in cases like this is unqualified, and is apparent to every one. The duty in that behalf is clear and beyond question. [Citing cases.]

"Failure to perform this duty, and to comply with this obvious requirement, properly entails consequences which follow almost automatically and as a necessary result therefrom. The almost necessary presumption is that the purpose of a failure in this respect has been to cover up or conceal what the records accurately kept would disclose. [Citing cases.]

"There is a compelling necessity for strictly enforcing the provisions of these rules and of this presumption. The failure to keep accurate accounts often means endless confusion from which there is no relief. 'No court is equal to the examination and ascertainment of the truth of the claims in much the greater number of cases' where the fiduciary lends his efforts to confuse. *King v. Remington,* 36 Minn. 15, 25-26, 29 N. W. 352. . . . "

The judgment is reversed (except as hereinabove noted) and the cause remanded, with directions to require a full and complete accounting from Wool Growers Service Corporation and Ragan & Dunnett of all

moneys and properties of Polonio Allarbe and Simcoe Sheep Company which came into their possession.

BEALS, STEINERT, and JEFFERS, JJ., concur.

BLAKE, J. (dissenting in part)—I concur with the majority as far as they go. However, I think the evidence is more than sufficient to hold the Federal Intermediate Credit Bank to an accounting—at least to the extent of all Simcoe funds received by it and applied on Ragan & Dunnett's obligations. The correspondence in the Olney deal was sufficient to arouse its curiosity as to how Simcoe's assets were being handled. It was obvious even then that Simcoe and its assets were being used largely, if not solely, to buttress the financial positions of Wool Growers and Ragan & Dunnett with the bank. And, when the financial statement submitted with the application for refunding Simcoe's loan came in showing that Ragan & Dunnett, the president and secretary, owed the company twenty thousand dollars, the bank certainly was put on notice that funds of Simcoe's were being diverted to other than corporate purposes. From then on, June, 1931, under the rule laid down in the following cases, the bank is equally liable, as a trustee *de son tort,* with Wool Growers for such moneys of Simcoe's as were released from the lien of the mortgage and turned over to Ragan & Dunnett and used by them for other than corporate purposes. *Russell v. McCall,* 141 N. Y. 437, 36 N. E. 498, 38 Am. St. 807; *Penn v. Folger,* 182 Ill. 76, 55 N. E. 192. See *Goodwin v. American Surety Co.,* 190 Wash. 457, 478, 68 P. (2d) 619. 1 Perry on Trusts and Trustees (7th ed.), 435, § 245. In the section cited, Perry says:

"He [trustee *de son tort*] is a sort of *de facto* trustee who is not allowed to escape the responsibilities and liabilities which he has voluntarily assumed. Thus where a trustee wrongfully but without fraudulent intent, turned over to the life beneficiary a large

amount of trust securities, it has been held that the life beneficiary became a trustee *de son tort* in the absence of evidence that she denied the trust or acted in hostility to it. 'Not having acted in hostility to, or in fraud of, the trust, she may be said to have constituted herself by her acts a trustee *de son tort* of the trust properties. That is to say there had been such a voluntary assumption of responsibilities by her with respect to the trust estate, or to a part thereof, as to estop her and the representatives of her estate from denying an equal and continuous accountability with the trustee, when called upon by those entitled to assert claims to the estate.' *This class of trustees has been held to include those who with knowledge of the trust participate with the express trustee in an unauthorized use of the trust property, without, however, denying the beneficial interest of the cestui.*" (Italics mine.)

SIMPSON, C. J. (dissenting)—I shall refer to Allarbe as though he were the sole appellant.

In approaching a consideration of this case, I will admit, *arguendo*, that Allarbe was unjustly deprived of his money by the acts of Ragan and Dunnett, and that a trust relationship existed. I do contend, however, that Allarbe, with full knowledge of his alleged wrongs, made a complete settlement with Ragan and Dunnett, and afterwards confirmed that settlement by taking over and conducting the sheep business of the corporation.

"The basic element of a compromise is a disputed claim." *Cannavina v. Poston,* 13 Wn. (2d) 182, 124 P. (2d) 787.

A settlement is as conclusive as a final judgment. *State ex rel. Great Northern R. Co. v. Superior Court,* 60 Wash. 187, 110 Pac. 808. Accord: *Snohomish River Boom Co. v. Great Northern R. Co.,* 57 Wash. 693, 107 Pac. 848; *Crocker v. Boyd,* 88 Wash. 685, 153 Pac. 1076.

The majority mention that Allarbe was an ignorant Spaniard; but let us see what kind of man the record discloses him to be. He came to this country from

Spain in 1906 and to Yakima county in 1907, and at the age of fifteen started in the sheep business which he has since continued. At the beginning of the depression he had accumulated a fortune of $50,000 from his operations. Any man who can amass $50,000 is, to use an old expression, "nobody's fool." Through the years he was compelled to engage in many business transactions, in handling, buying, and selling sheep and wool, in leasing ranges, in hiring men, and in buying supplies for his operations. He did some banking business also. He was able to and did keep account of the gas and groceries used. True, he could neither read nor write, but did speak and understand English. In passing upon this question and the credibility of this man, the trial court stated:

"Allarbe is a Spaniard, with a limited knowledge of the American language. He is not educated nor of more than normal mentality. He has been in contact with sheep and especially as to handling sheep, he is well advised by experience. He is more or less ignorant of business transactions, but to what extent it is difficult to determine. He responded readily to questions of his own attorney, but cross-examination by other counsel could elicit but little information. I assured myself that he understood the questions but for the greater part, his answers were 'I don't know.' His testimony was far from being fair and candid.

"Ragan was not candid and plainly was attempting to testify not necessarily untruthfully but in the manner best to serve his case. His initial step in using the money of Allarbe for his own purpose and his very apparent disregard to Allarbe's participation in the business, is the glass through which we must view all of his actions and his testimony in this case.

"I cannot give great credibility to either Allarbe or Ragan for those reasons. I think Allarbe understood what he was doing when they incorporated and also understood the recitals as to the amount contributed by him. He possibly did not appreciate that he was bearing the burden of the venture for five years, at the end of which if unsuccessful, he would recover his stock and no more under the pooling agreement. . . .

"I think Allarbe understood the entire set up; the fact of incorporation in order to borrow money; the contemplated loan by Plaintiff; the purchase of the Olney and Kays sheep, and the proposed management of the Simcoe Sheep Company by Ragan. In none of these things can I find any actionable wrong on the part of Plaintiff, nor reason for believing that it was thus creating a basis for subsequent fraud to be perpetrated on the Simcoe Sheep Company. . . .

"I made one hundred forty-four pages of single spaced notes during the eight weeks of trial and sought to keep understanding analysis of each of the very numerous episodes or items testified to. . . . "

In this connection, the majority adopts a rule taken from a decision of a court commissioner of Nebraska, *Faulkner v. Simms*, 68 Neb. 295, 89 N. W. 171, 94 N. W. 113. I cannot see the application of the rule to this case. A reading of that case demonstrates that the evidence taken in the trial court was written and much of it was in the form of stipulations as to what certain witnesses would testify to if present. In the instant case, many witnesses were present and testified during the course of the trial, and their credibility and the weight to be given to their evidence was fully tested by the trial court. True, in this state, cases in equity and those law cases tried to the court must be tried *de novo*. Rem. Rev. Stat., § 1736 [P. C. § 7321]. In many cases, we have made statements relative to the consideration to be given the judge who saw the witnesses and heard them testify. Typical of these holdings are the following:

"The sole question raised by the appeal is whether or not the findings are supported by the evidence.

"A case of this character, where witnesses for the respective parties tell stories which are diametrically opposed, always presents a difficult problem to a trial court, and a more difficult problem for an appellate court. Recognizing such difficulty, this court has long adhered to the rule that it will not disturb the judgment unless the evidence clearly preponderates against the findings of the trial court. This, because the trial

court has a distinct advantage in ascertaining the truth, by reason of the fact that he has the opportunity of observing the witnesses while they are testifying." *King v. Brehme,* 174 Wash. 61, 24 P. (2d) 453.

"There was a conflict in the evidence, and the court resolved that conflict in favor of the bank. Findings of the court are to be considered as verities in support of the judgment unless they appear by the record to be contrary to the clear preponderance of the evidence. *Herz v. Ransom,* 168 Wash. 512, 12 P. (2d) 750; *Rockwell v. Peyran,* 172 Wash. 434, 20 P. (2d) 841. In this case, the evidence does not preponderate against the findings made by the court." *Puget Sound Nat. Bank v. Olsen,* 174 Wash. 200, 24 P. (2d) 613.

"It is the well settled rule that the findings of the trial court on conflicting evidence will not be disturbed unless the evidence clearly preponderates against them. *King v. Brehme,* 174 Wash. 61, 24 P. (2d) 453; *Puget Sound National Bank v. Olsen,* 174 Wash. 200, 24 P. (2d) 613; *Grimes v. Fraser,* 178 Wash. 511, 35 P. (2d) 88; *Collins v. Larson,* 180 Wash. 171, 38 P. (2d) 1057. The evidence in this case is in utter conflict. There was substantial evidence in support of the findings made by the court, and a careful scrutiny of the entire record fails to convince us that the preponderance of the evidence is against the findings. We must, therefore, accept the findings of the court as verities. This disposes of the questions of fact." *Kelly v. Bank,* 188 Wash. 614, 62 P. (2d) 1359.

It is my contention that the court had a much better opportunity in this case to measure the credibility of appellant and the weight to be given to his testimony than in an ordinary case which lasted but a few hours or days. The court saw and heard the appellant testify, and, at different times during the eight weeks of trial, he had the opportunity of measuring him while in the court room. *Henriod v. Henriod,* 198 Wash. 519, 89 P. (2d) 222. The court observed appellant's conduct and demeanor when he testified, and noted his countenance and demeanor while he was seated in the court room. From all these facts, the court was able to and did measure the appellant's value as a witness, and was able

to ascertain with certainty his ability to understand English and to know what was being said by the various witnesses, the court, and the attorneys. It seems to me that this is a typical case for applying the rule that trial judges are better qualified to determine the credibility of witnesses and the weight to be given to their testimony.

I propose to show from the record that Allarbe and his attorneys were fully acquainted with the situation; that Allarbe, with full knowledge of the wrongs perpetrated upon him, made full and complete settlement, and that the attorneys representing respondents in this case not only gave appellant's attorney full opportunity to examine all the records of the company, but aided and assisted appellant's attorneys in every possible way. Further, that Allarbe, after the settlement, took possession of all of the property of the Simcoe Sheep Company which had been turned over to him at the time the settlement was made, and that he conducted the sheep business for a considerable length of time and only brought this action when he had lost money in the venture, which loss was occasioned by the depression as much as anything else.

Sometime during October, 1932, Allarbe came to the conclusion that Ragan and Dunnett had misapplied some of the moneys he had invested and had otherwise converted much of the property to their own uses. He then sought the aid of Mr. Seijas, a member of the Seattle bar, who spoke Spanish. Seijas, with the aid of Jack O'Conner, who had been discharged by Ragan, commenced an investigation concerning the sheep business conducted by Ragan. O'Conner continued to advise Allarbe until the settlement in May, 1934. O'Conner, testifying for appellant, stated that Allarbe, in April, 1934, was charging "just everything that had been mentioned here in court."

Seijas and Allarbe attended the stockholders' and trustees' meeting in December, 1932.

After considerable investigation, Seijas drew a complaint for Allarbe against Ragan and Dunnett and the Wool Growers, but never filed it. Then Allarbe and O'Conner discharged Seijas and employed Charles Bolin, a Yakima county lawyer. Bolin continued the investigation for Allarbe. Allarbe complained to Bolin that Ragan & Dunnett and the Wool Growers had appropriated from thirty to forty thousand dollars of his money, and had turned the Simcoe sheep into the bands operated by Ragan & Dunnett. These charges were communicated by Bolin to Dunnett and the Wool Growers.

Mr. Bolin then drew a complaint which was never filed.

In November, 1933, Frank J. Allen of the Yakima bar became associated with Bolin. During the next six months, Allen and Bolin made a complete, thorough, and exhaustive examination of the affairs and the operations conducted by Ragan & Dunnett and the Wool Growers. The extent of the investigation is best told in the words of Mr. Allen while on the stand:

"I first went down to Mr. Richards and Mr. Delle's office and asked to see the minute book. Someone went across the hall to the Wool Growers and got the minute book and I there in that office made notes of what I found. After having digested that and made notes of what had taken place I had numerous conferences with Polonio Allarbe, Mr. Jack O'Conner and Mr. Stephen Rodrick. These occurred at different times and on different occasions, sometimes one was present, sometimes two were present, sometimes three were present. I talked with Mr. Hubbert. I also received some communication from Mr. Seijas and after numerous conferences with Mr. Polonio—I think that covered about all that I spent in examining the original incorporation. That occurred sometime in October or November, 1933, and occupied a period of two or three weeks.

"Then we had an investigation of the loss of paraphernalia such as horses, machinery, and rifles, and the purchase of merchandise by Ragan & Dunnett and charged to Simcoe Sheep Company. We then investi-

gated hay, barley and potatoes at the Foster place and the claims of the Yakima Hardware and the Yakima Tent & Awning Company.

"I went to the Wool Growers office and got out all of the statements for the wool from the first time that they started and checked over the production and what they got for it and the value of the wool and what was done with it. Then I also went over the sheep that were shipped from the time they started until the time I was investigating to see that the number that were shipped was sold and the prices received and the credits to the Simcoe Sheep Company. I also went over the Wool Growers books as to the purchase of the Kays sheep and the Olney sheep.

"I examined the minute book, by-laws, articles of incorporation of the Simcoe Sheep Company, particularly the minutes of the first meeting and everything they had in there up to November, 1933. I went over the books of the Wool Growers regarding all loans made to the Simcoe Sheep Company. I investigated the first loan made and the amount taken out for payment of the Kays sheep. I learned they took out of the $30,000.00 loan money to be paid for the Kays sheep that were already supposed to be paid for. The amount was $8,000.00 or $9,000.00. I found they also took out between $4,000.00 and $5,000.00 interest of Ragan & Dunnett. I worked at this investigation since the middle of October or November, 1933."

Mr. Allen had a meeting with Ragan and Dunnett when Mr. Conklin and Mr. Richards were present. Testifying relative to this meeting, Mr. Allen stated:

"Mr. Richards said to me at that meeting, he was the first to speak, 'What is all the fuss about, what does Polonio Allarbe want?'

"I said that he [Polonio Allarbe] had found out that a lot of money and a lot of sheep, these people had defrauded him of, and wants his money back. Ragan took his money and bought sheep at excessive prices, bought some in his own name that were never given to Polonio, out of Polonio's money. I mean the Simcoe Sheep Company money when I put Paul [Polonio]. He used money for ranges and bought hay and grain with it, and used it for his own sheep, stole range off Paul and put it in his own name, took the Simcoe

Sheep Company's money and paid it on a contract to purchase land from the railroad company. Ragan said that it wasn't so, he didn't steal any range. I said to Mr. Ragan at that meeting that he owed the Simcoe Sheep Company $14,000.00 and he never paid that; and that he paid on his own note moneys that belonged to the Simcoe Sheep Company. I said to him that he borrowed money from the bank and paid it on his own note and bought decrepit, toothless old sheep from Olney and paid a big price for them. I also told him that he did it for the use and benefit of the Wool Growers. I tried to cover every complaint that we had.

"I told him that they had used the sheep company's money to pay on the Olney range and had no business to do it. That is what he did. They paid back range fees on the Olney range with Polonio's money, with the sheep company's money, and used Simcoe Sheep Company money to pay back range on the Kays sheep too. I claimed that he paid too much for them in order to pay out the mortgage to the Wool Growers. I told him he purchased sheep with the Simcoe Sheep Company money and had taken them themselves and never accounted for it. I told Mr. Ragan that he had stole two car loads of lambs going to Chicago, and he said that I was a liar. He tried to cover everything possible, because he thought we were going to get some money. I told them they had cheated us out of about thirty-five thousand dollars, and I thought we could recover fifty thousand dollars and we were going to bring suit for it.

"I accused Mr. Ragan for being responsible for the switch to Archie Prior of the Crawford Creek range belonging to the Kays to the McCready Creek range belonging to Prior [Crawford Creek carried two bands of sheep and McCready Creek range one band].

"I accused Mr. Ragan of keeping the money in his own pocket for two years and not accounting to the Simcoe Sheep Company for it.

"I accused the Wool Growers of unloading the Kays and the Olney sheep upon the Simcoe Sheep Company and getting Ragan to use Simcoe Sheep Company money for that purpose.

"I don't remember saying anything at that time about the pooling agreement, although I knew about it. I claimed that they were liable, because they were acting in cahoots with Ragan & Dunnett in unloading these

sheep to the Simcoe Sheep Company and getting an excessive price.

"After that I repeatedly told Mr. Conklin when I found out anything, what I found out, and particularly of this money that they had taken out of the first mortgage, the $4,137.00, and credited on Ragan & Dunnett's interest due the Wool Growers. Mr. Conklin asked me if I supposed Polonio would be willing to take back the sheep and dissolve the pooling agreement, if Ragan & Dunnett would give up their stock, if he would sign releases for everybody and call every thing off. I said that I didn't know, I would take it up with him.

"I told Allarbe every day what occurred. . . .

"I told Mr. Conklin that we would make the settlement after the meeting at which Ragan refused to give up the Olney range. Mr. Allarbe authorized me to make a settlement. The meeting on May 28, 1934, was held in the Wool Growers' office. There was Charlie Bolin, and myself, and Polonio,. and Stephen Rodrick, and Masters, and Dale Simmons, and that other young man in the office, Mr. Lawson, and Mr. Dunnett, Mr. Ragan, and Elery Van Diest was in a part of the time, and Mr. Conklin.

"We had previously gone over what the fellows called the creditors' agreement. At that time, he handed me two other papers, called releases, but I don't remember what the other one was. Charlie and I stepped out in the hall and looked these papers over together, and then we came back into the room. . . .

"At a certain point in the meeting, I explained to him, Polonio, that now this—I did, yes. After Mr. Conklin had read the new papers releasing the other, I said, 'Now, Polonio, understand that if this goes through, if you agree to this, then you have waived any right you may have to any claims at all through or for the benefit of the Simcoe Sheep Company, and there would be no more lawsuits. It is all settled. You won't have any— you will get back your sheep, but you won't have any claim against them.' "

The statement just referred to was made to Allarbe prior to the time the release was signed.

The trial court listened to the testimony of Mr. G. A. Conklin of the law firm of Richards, Conklin & Delle,

attorneys for the Wool Growers Service Corporation. Mr. Conklin testified as follows:

"The Wool Growers Service Corporation and Ellis Ragan consulted me about certain charges made against them in regard to the Simcoe Sheep Company. I myself, personally, took care of the complaints made against the Wool Growers Service Corporation and Ragan & Dunnett by Polonio Allarbe. Mr. Allen, claiming to represent the Simcoe Sheep Company and Polonio Allarbe, made the charges to me against the Wool Growers Service Corporation and Ragan & Dunnett.

. . .

"I had eight or ten conferences with Mr. Allen and at one of those he said that he had discovered enough that, if he could obtain an accounting, it would recover a judgment of about $50,000. Mr. Allen, on a couple of occasions, was in the Wool Growers Service Corporation and wanted to get the books so that he could determine questions as to sales and loans. Mr. Simmons was there on those occasions. The information he desired was given to him. . . .

"We had a meeting in Mr. Richards' office about the middle of April, 1934. Mr. Richards, Mr. Allen, Mr. Ragan and I were there. Mr. Allen, in reply to Mr. Richards at this meeting, stated that he had spent quite a considerable lot of time in going over the Simcoe Sheep Company and the Wool Growers Service Corporation books. They were satisfied that this $45,900, contributed by Polonio Allarbe and Severiano Galanena, had been taken and used by Ragan for his own benefit; that he had bought sheep with part of that money. Mr. Allen said that he was satisfied that he could prove that the Wool Growers Service Corporation and Ragan & Dunnett had conspired together to sell the Kays sheep to Allarbe and Galanena at an exorbitant price; and satisfied that the Olney sheep had been sold at more than their value and that Ragan had used range of the Simcoe Sheep company for his own benefit without any payment to the Simcoe Sheep Company; and that Simcoe money had been used to pay for range of Ragan & Dunnett. . . .

"We made him an offer to permit him to go through our books with his own accountant, and sit down with him and determine if any misappropriations of money

were made, from the time of the formation of the Simcoe Sheep Company, by Ragan & Dunnett or the Wool Growers Service Corporation, and if it was shown to us that such a misappropriation had occurred, either Ragan or the Wool Growers Service Corporation would pay it. Mr. Allen did not avail himself of this offer, saying that he would make his own investigations in his own way. Mr. Allen said he did have the books of the Simcoe Sheep Company. . . . "

Speaking of the meeting of May 28, 1934, and the agreement settling the controversy, Mr. Conklin said:

 "It was determined to hold the stockholders' and trustees' meeting to have this agreement formally put up to them. Mr. Allerbe, Mr. Ragan, and Mr. Dunnett were the trustees of the Simcoe Sheep Company at that time. Ragan & Dunnett, Allarbe, Bolin, Allen, myself, Mr. Simmons, Rodrick, Masters, and Elery Van Diest were present at this meeting. I think Mr. Lawson was present. I prepared the creditors' agreement and the minutes for the meeting and, I think, the resignations of Ragan and Dunnett and forms of releases.

"It was explained to me that Rodrick and Masters were there as friends and advisers of Allarbe. . . . So I said that these negotiations had run over a long period of time and they had been pieced together from various conferences and various meetings at various times, and I thought, to round this thing up, a general statement of the purpose and intents to be accomplished should be made. So I stated to those present that I wanted every one there to clearly understand what the meeting was for and what should be accomplished at the meeting. And I said that, heretofore, Mr. Allen, representing Mr. Allarbe and the Simcoe Sheep Company, had charged that the Wool Growers Service Corporation and Ragan & Dunnett and Joe Sears had conspired together to beat Polonio out of his money, and they had used some of his funds for their own behalf. And I enumerated the various things that Allen had charged us with.

"I will explain what I said then. I explained that I wanted every one there to clearly understand and comprehend what this matter was all about and what we were there for. And I said that, heretofore, Mr. Allen, representing the Simcoe Sheep Company and

Allarbe, had charged that the Wool Growers and Sears and Ragan & Dunnett had conspired together to defraud Allarbe and the Simcoe Sheep Company out of their money and their property.

"That Allarbe and Fat had turned over to Ragan $45,900 in the beginning to be invested in sheep, and they claimed that Ragan had misappropriated some of those funds for his own benefit and had used some of that money to buy sheep. And that Ragan and the Wool Growers had sold off these Kays sheep at a price in excess of their real value and had sold the Olney sheep to the Simcoe Company for more than they were worth; and that out of the first $30,000 loan the Wool Growers had taken $8,760 and used it to pay the balance which they claimed to be due on the sale of the Kays sheep, or on their mortgage on the Kays sheep. They claimed that the Wool Growers had unlawfully taken $4,100 of the Simcoe money out of that first loan and arbitrarily applied it on indebtedness owing by Ragan and Dunnett to the company.

"I explained that Allen had charged that Ragan, as manager of the Simcoe Sheep Company, had purchased range for himself and paid for it with Simcoe funds, and that he had trespassed his sheep upon ranges belonging to Simcoe Sheep Company and hadn't paid them for the use of the ranges. And I said that generally they charged that Ragan had fed up hay and grain and pasture, bought and paid for with Simcoe funds, to his own sheep. That is, he had allowed his own sheep to eat up hay, grain, and pasture belonging to the Simcoe Sheep Company and hadn't paid for it.

"They charged that Ragan had commingled his sheep with those of the Simcoe Sheep Company so that, in the replacement, he got better lambs than he put into the Simcoe flocks. I enumerated each and every of the charges that had been made insofar as I could remember them, and I think I was careful to relate each and every charge that had been made because I was very careful and cautious that everybody understood exactly what was going to be done.

"I went on after I had enumerated these various items and stated that, now, as I understand—and I explained here that these negotiations had been carried on to the point where Allen, as representative of Allarbe and Simcoe Sheep Company, had reached an

agreement with Ragan & Dunnett and the Wool Growers to settle this matter.

" 'Now,' I said, 'the proposed settlement is this—that Ragan and Dunnett are to resign as officers and trustees of the Simcoe Sheep Company. They are to assign and transfer all of their stock in the Simcoe Company to Allarbe, and the Pooling Agreement is to be dissolved. The accounts of these creditors, who have signed this agreement, are to be secured by a second mortgage running to the Guaranty Trust Company as their trustee. Ragan and Dunnett are to get out of the company and Allarbe is to become the sole and only stock holder, that is, insofar as Ragan and Dunnett are concerned.' . . .

"Polonio Allarbe signed that agreement for himself and Severiano Galanena as attorney in fact. The records did not show that Severiano Galanena's interest had been transferred and, as this was a stockholders' and trustees' meeting, we had Polonio Allarbe sign as attorney in fact for Severiano Galanena. Ragan and Dunnett signed it individually and as co-partners. Masters and Rodrick signed as witnesses to Allarbe's signature. The creditors had previously signed it. The minutes of the special meeting of the stockholders and trustees were marked Exhibit 16. These minutes were signed at that meeting."

Passing upon the testimony which I have just set out and other evidence in the case, the trial court stated in his able and comprehensive memorandum opinion as follows:

"Coming now to the releases claimed to have been given. There is ample evidence to indicate that Ragan had been guilty of some of the acts charged against him in the management of Simcoe Sheep Company. But it is not necessary that Ragan or Plaintiff be guilty of any act to the detriment of Simcoe Sheep Company to justify releases. It is sufficient that they were charged with faults and that suit was threatened against them.

"We find Allarbe suspicious of Ragan and retaining Seijas to investigate, and becoming suspicious of Seijas retaining Bolin and Allen for the same purposes. He believed that Ragan was appropriating money and

property of Simcoe Sheep Company to his own use or that of Ragan and Dunnett.

"Bolin and Allen found these wrongful acts to have been committed in their opinion. They believed these wrongs had been committed and for that matter, still believe it. They say they learned that between Eight Thousand Dollars and Nine Thousand Dollars was taken from Allarbe and Simcoe Sheep Company in connection with Kays sheep. That between Four Thousand Dollars and Five Thousand Dollars belonging to Simcoe Sheep Company was applied on debts of Ragan and Dunnett. That Ragan had taken feed and ranges of Simcoe Sheep Company for use of Ragan and Dunnett. That he had taken Simcoe Sheep Company money and paid for his own ranges and to buy railroad range land. That he borrowed Fourteen Thousand Dollars and never paid it back. That he had borrowed money for Simcoe Sheep Company and used it for his own purposes. That Plaintiff and Ragan had caused the purchase of the Kays and Olney sheep at a very high price for Plaintiff's benefit. That they used Simcoe Sheep Company money to pay back range fees on Olney range and Kays ranges. That Ragan and Dunnett had purchased sheep with Simcoe Sheep Company money and not accounted for them. That they had stolen two carloads of sheep when going to Chicago. That they had cheated Allarbe and Simcoe Sheep Company out of Thirty-five Thousand Dollars, possibly Fifty Thousand Dollars. That Ragan had kept Simcoe Sheep Company money in his own account without accounting for it. That Ragan purchased supplies for himself with Simcoe Sheep Company money and took personal property from that Company. That he took the top sheep and other sheep from Simcoe Sheep Company for himself. That Ragan used the greater part of the money turned over by Allarbe to him for his own uses. These things and possibly others I have overlooked were ascertained and were told to Allarbe by Allen. At this time they contemplated suit against Plaintiff and Ragan and Dunnett to recover for these acts and misappropriations and had informed Plaintiff of their intentions. Then it was that Conklin suggested the settlement by which Allarbe would own the Simcoe Sheep Company with its attendant stipulations. The evidence shows that Allarbe was kept advised of the

various negotiations which consummated in the meeting of May 28.

"*It seems to me that upon all the evidence there can be no question but what Allarbe understood there was a settlement to be made by which he was to get the Simcoe Sheep Company to himself, and that he went up to the meeting knowing that there was to be a consummation of that settlement.* At that time he knew of the long list of wrongs he was informed had been perpetrated against him, and I cannot believe he did not know that he was settling all his wrongs in getting his sheep back.* What was done at that meeting is a matter of conflict in the evidence. I have followed Mr. Conklin's recital through carefully and I find him doing about what I would have done, had I been an attorney in his place. Prior to that time, Allen had procured a statement showing number of sheep and quantity of property with indebtedness of Simcoe Sheep Company and its value had been canvassed with Allarbe and his friends. It seems to me that what Conklin and Allen testified to as to what happened at that meeting is what would naturally happen. An attorney preparing for such a meeting in advance of it, would canvass the things to be done, and attend the meeting, prepared to do them in a certain way, armed with the previously prepared papers. So it seems to me that logically, they would canvass the charges made against Plaintiff and Ragan and the settlement of those charges at this meeting. I think that was done. Whether Allarbe understood fully what was going on is another question. I think he understood that he was giving up his claims for damages and was getting his sheep back; that Ragan and Galanena were getting their notes back, which meant although he may not have appreciated the result, that the pooling agreement was terminated. He understood that he was not to get the Olney range, and that Plaintiff would finance the Company if McGuffie was manager. He may not have understood the machinery by which that result was accomplished; the reorganization of the Company after Ragan and Galanena were out for the purpose of executing the releases; although he understood the necessity for signing papers and the purpose of the papers signed to accomplish the settlement. This includes his own release as well as that given by the Sheep Company. I put my-

self in the position of an attorney handling the re-organization of the Company by picking friends of Allarbe as figure heads to fill the necessary positions to transact the business for Allarbe's benefit. The entire matter became more a matter of form than substance, so long as Allarbe was given what he had bargained for.

"There is much for Allarbe to complain of since the beginning of his relations with Ragan, but if we analyze the situation I think we find our sympathy for his wrongs tending to warp our judgment on the question of existing fraud in the settlement. I cannot help but feel that he knew enough of the proposed settlement to know that he was electing between an action to recover for his losses and the turning over of the entire Company to him. That it left him loser on his original investment was true, but I think he knew that. He might well have understood the difficulty of proving many of the items of loss against Ragan, as the evidence in this case has demonstrated.

"There is no question concerning the fact that Plaintiff and Ragan were seeking to have themselves freed from all claims whatever, and that Bolin and Allen fully understood that. They represented Allarbe in their negotiations and agreements with Plaintiff and Ragan, and understood that all claims of every kind were to be released by Allarbe and Simcoe Sheep Company. If Bolin and Allen practiced fraud upon Allarbe, there is no connection of Plaintiff or Ragan shown therein, outside of the fact that the settlement was advantageous to them assuming the guilt of either one. There is no connection of Plaintiff and Ragan with Bolin and Allen other than as adversary parties and no inference that I can see that they influenced Bolin and Allen by any unfair method to agree to the settlement. The language of either an oral or written agreement is construed in the light of attendant circumstances and they leave no doubt in my mind, that the language here used was meant to cover every possible right of recovery which Allarbe or Simcoe Sheep Company might have against Plaintiff or Ragan and Dunnett save alone in relation to the current unpaid mortgage. I think Allarbe understood it in that way and that he agreed to it upon advice of his counsel, who beyond question so understood it. . . .

"There is no question but that the financial condition

and the immediate stress under which the Company was laboring was given consideration in his determination. But it also appears that the assets of the Company; the probable income from wool and sheep and in fact all the chances of successful operation of the Company, were investigated by Allarbe and his attorneys, showing a decision after study and deliberation rather than a coerced acquiescence in a plan laid down by Plaintiff." (Italics mine.)

I acknowledge the rule that a release of this nature will be scrutinized closely by the court to determine if it was fairly obtained. In this regard, the burden lies upon the fiduciary to prove such to be the case. *Appeal of Cunningham,* 122 Pa. St. 464, 9 Am. St. 121. However, this qualification does not abrogate the general rule that a beneficiary may release his fiduciary. Restatement of the Law of Trusts, § 217; *Ingram v. Lewis,* 37 F. (2d) 259.

If the release is properly obtained, it is binding upon the fiduciary, and he cannot complain merely because he made a bad bargain. *Ballard v. Cox,* 193 Wash. 299, 75 P. (2d) 126.

Just prior to and at the time the settlement agreement was entered into, appellant made every accusation which he now makes against the respondents. His attorneys made as complete an investigation as they desired, and it impresses me, as it did the trial court, that the investigation was quite thorough. True, one of the witnesses, a bookkeeper familiar with the books of Ragan & Dunnett, testified that it would be necessary to secure an audit in order to have an absolutely accurate report of the finances of the ventures involved. This might well be said to be true of any transaction involving the operation of an extensive business venture. However, the investigation made was complete enough to lead to general conclusions as to appellant's rights and remedies. Furthermore, it does not appear that appellant ever desired an audit or that one was not available to him. Allarbe was told and he understood

what he was giving up and what he was receiving. He understood that he faced two difficulties in the future—refinancing and securing a range. The fact that he placed more confidence in the ability of the Bolins as to what they could or would do in this regard than was justified will not invalidate the contract. There is no evidence that any of the respondents misled Allarbe in this regard. The Wool Growers carried out their part of the agreement to finance the Simcoe Company for the balance of the season. Far from being over-reached by any conduct or acts of the respondents in effecting the settlement, appellant can blame his own judgment in this matter.

Touching the settlement, there was no misrepresentation, concealment, or fraud that led to the execution of the release. Appellant sought and obtained outside assistance, and it was the consequence of the advice and counsel of this assistance that the settlement was obtained. Obviously, appellant distrusted respondents and did not rely on them or their advice at that time. When a beneficiary secures the advice of friends or attorneys of his own choosing and relies on their advice and there is no evidence that fraud was practiced on such counsel or friends by the trustee, then the trustee is relieved of the charge of fraud. I am impressed with the California case of *Colton v. Stanford,* 82 Cal. 351, 23 Pac. 16, 16 Am. St. 137, in which the court said:

"Of course, in all trust relations the existence of confidence will be presumed, and if it appear that any advantage has come to the trustee in dealing with his *cestui que trust,* the burden will be thrown upon him to show that confidence was not in fact abused. But it has always been held, as we understand it, that this presumption might be overcome by proof of the fact that confidence had not been abused, and that the beneficiary acted, not upon any reliance or confidence placed in the trustee, but upon the advice of an independent, professional, disinterested, and competent adviser.

"Here, therefore, we have a case in which—assuming the existence of a fiduciary relation, and that the pre-

sumptions as to confidence and the burden as to proof are as claimed by appellant—the undisputed facts show that there was absolutely no confidence reposed by the beneficiary, but that she acted exclusively upon the advice of several disinterested experts and professional friends, specially selected to investigate and counsel her, because of their ability and familiarity with the affairs of the trustees with whom she was dealing, and who acted toward her in the highest good faith."

This case has been cited as authority with others in *Bettendorf v. Bettendorf*, 190 Iowa 83, 179 N. W. 444; 945. I quote:

"The appellant contends, however, that the widow acted on the advice of C. N. Voss, and entirely disconnected herself from any reliance on the defendant. The fact of having obtained the independent advice of a third party does not alone obviate the presumption of the exercise of undue influence. It is merely a circumstance tending to show the *'uberrima fides'* of a transaction between the fiduciary and the beneficiary. The purpose of such proof is to establish the freedom of the *cestui que trust* from any influence or control of the trustee. This may be done by proof that the beneficiary acted on his own judgment, or solely on the advice of another. Manifestly, if either of these situations is established, the dominant party could not have exercised control in bringing about the deal between himself and the *cestui que trust*. The effect of this would be to obviate the presumption of unfair dealing quite as completely as proof that the *cestui que trust* was fully advised of all the facts, and, being *sui juris*, acted freely in dealing with the trustee. The force to be given proof of independent advice necessarily depends on whether the adviser has been put in possession of all the facts and circumstances, and, if not, whether the means of inquiry to ascertain these were at hand: in short, whether the adviser was so informed of the facts as that he might intelligently guide the *cestui que trust* in reaching a determination, and whether the *cestui que trust* relied entirely upon the advice given, in connection with what he may have known himself, and without placing confidence in the trustee. [Citing cases.]"

Accord: *Wertz v. Clay,* 157 Va. 263, 160 S. E. 27; *Forbes v. Forbes,* 5 Gill (Md.) 20.

In the last cited case, the court said:

"Every facility was furnished by the defendant for the examination of the accounts, and we have no evidence of any books or accounts being kept back. They were examined by the parties or some of them, and by the solicitors of the parties fully able and competent to determine what was due from the trustees to the *cestuis que trust.* This examination gave rise to the compromise, and release made on the 30th of April, 1830, and forms the basis of the release executed on the 8th of June, 1831, after the complainant arrived at age. It is immaterial whether the complainant examined the books and accounts of the trust, or not. It is sufficient that they were examined by persons competent to make the examination for him."

It may be admitted that silence where there is a duty to speak can, on occasion, result in a finding of fraud on the part of the trustee. 53 C. J. p. 1223, § 38; *Oliver v. Oliver,* 118 Ga. 362, 45 S. E. 232. This does not mean, however, that it is the trustee's duty to outline every detail in effecting a settlement of a disputed claim.

In the case of *Bakamus v. Albert,* 1 Wn. (2d) 241, 95 P. (2d) 767, this court upheld a release which it was alleged was obtained by fraud. It appears that, when the release was signed, certain information was withheld from the releasee. In passing upon that question, we said:

"The mere fact that respondent Albert refused to answer questions propounded to him by appellant's counsel, did not constitute fraud; it would seem that his conduct on that occasion would have rather tended to suggest that further investigation was advisable; but in any event, it cannot be held that his conduct at that time constituted fraud on appellant. . . .

"In the case at bar, appellant was in full possession of her faculties and had the benefit of the advice of counsel."

In the case of *In re Schoenewerg's Estate,* 277 N. Y. 424, 14 N. E. (2d) 777, the remainderman, who at ter-

mination of a trust signed a release upon having received a report of the trustee in form as presented to the court, was held precluded from raising objection of an illegal mortgage transaction. The court said:

"We think this ruling was right. No claim was made by the petitioner of actual imposition practiced upon him. His testimony was that he had understood the objective nature of the instrument of release. In the account accepted and retained by him was a schedule which showed that the mortgage investment in question had been defaulted and was in process of reorganization. No proof of any misrepresentation or of refusal to disclose any fact was offered.

"This being his case, the petitioner may not be heard to say that the accounting trustee owed to him as remainderman an affirmative duty to detail an open state of facts as to which he was content to waive inquiry."

There is some language in the case that would indicate that the court may not have considered the parties involved to be in a fiduciary relationship. However, in almost exactly the same situation, the accounting of a trustee to a remainderman, the court applied the rule of this case and designated the parties a trust relationship of which in my mind there can be no doubt. The court said:

"The law encourages the making of agreements for the release of fiduciaries and for the approval of their informal accounts principally because they avoid expense and delay. Except where fraud or imposition is shown, such agreements and releases are approved. [Citing cases.] The position of the objectant here is exactly the same as the petitioner in *Matter of Schoenewerg (supra)*, wherein it was stated that he 'may not be heard to say that the accounting trustee owed to him as remainderman an affirmative duty to detail an open state of facts as to which he was content to waive inquiry. There can be no legal implication of impropriety in such a business transaction.'" *In re James' Estate*, 19 N. Y. S. (2d) 532.

In the case under consideration, the claimed inexperience and ignorance of the appellant was overcome.

by the assistance and advice obtained from his counsel. The parties to the settlement were all satisfied from their investigations that the compromise settlement was the best bargain they could obtain, and, having made it, they cannot be heard to complain. To hold otherwise would go beyond the rule of honest disclosure between a fiduciary and a beneficiary, and make it impossible to deal with those other than educated business men. Anyway, the duty owing to appellant was quite obviously not existent at the time the settlement was made. At that time, the parties were all dealing at arm's length. If there had been a breach of trust relationship, it had already occurred, and it was due to that fact that the appellant was willing to negotiate and execute a settlement and release. For this reason, if for no other, I conclude that the parties were bound by their agreement.

As I view this case, in order to find for appellant, it would be necessary to find that Seijas, Bolin, Allen, and Conklin were guilty of fraud in securing the signature of Allarbe to the agreement of settlement.

I have read the testimony of Bolin, Allen, and Conklin with care, but cannot find even a suspicion of wrongdoing on their part. On the other hand, they were honest and sincere and made every effort to advise Allarbe and his friends concerning every detail of the Ragan & Dunnett transactions and just what he was to receive in the settlement.

The majority mention the fact that Seijas was paid $400 from Simcoe funds. That amount was earned by Mr. Seijas and the payments were made at the instance of Allarbe.

Allen and Bolin received a note from Simcoe for $7,500 in payment of their services. This note was made in compliance with a contract for legal services entered into by Allen and Bolin and Allarbe at the time they started their investigations. They earned their fee.

The majority, without pointing out any factual basis for its holding and without discussing the legal questions involved, holds that Allarbe did not receive any consideration for his agreement of settlement. The trial court held:

"There were considerations passing from both Plaintiff and Ragan and Dunnett for the settlement and execution of the releases. . . . The consideration passing to Allarbe (in effect the Sheep Company upon settlement) was the surrender of the stock of Ragan-Dunnett and Galanena to him, withholding foreclosure by the Plaintiff and the financing of the Simcoe Sheep Company by the Plaintiff during the current year of actual operations. There is no suggestion in the evidence that the pressure of threatened suit by Plaintiff compelled Allarbe against his wish to enter into the agreement resulting in giving the releases. His position is that he did not execute them; that they were made under circumstances violative of fiduciary relations existing, hence void. That they were not properly executed. But what is more to the point, he has contended consistently that the releases were meant to refer to matters of contract only and not to items of tort. He has sought to show that in the final settlement the long list of his claims were not discussed and were not considered as a basis of settlement. *This is inconsistent with the theory that he released his claims for damages because of threat of foreclosure.*" (Italics mine.)

The rule relative to the sufficiency of consideration is:

"If a person at the instance of the promisor waive or release his personal right to do any lawful thing, the waiver or release constitutes a valuable consideration for the promise." 6 Am. & Eng. Ency. of Law (2d ed.), p. 737.

"The rule is well settled that an agreement of compromise is supported by a sufficient consideration where it is in settlement of a claim which is unliquidated, where it is in settlement of a claim which is disputed, or where it is in settlement of a claim which is doubtful. There are cases to the effect that in order to support a compromise in avoidance of litigation the claim must be an actual one, founded upon a colorable right about which there is room for honest doubt and actual dis-

pute, and with some legal or equitable foundation, and not one which is without foundation, and is known to be so, or is in its nature an illegal claim out of which no cause of action can arise in favor of the person asserting it. The usual test, however, as to whether a compromise and settlement is supported by a sufficient consideration is held to be not whether the matter in dispute was really doubtful, but whether or not the parties *bona fide* considered it so, and that the compromise of a disputed claim made *bona fide* is upon a sufficient consideration, without regard to whether the claim be in suit or not. The law favors the avoidance or settlement of litigation, and compromises in good faith for such purposes will be sustained as based upon a sufficient consideration, without regard to the merits of the controversy or the character or validity of the claims of the parties, and even though a subsequent judicial decision may show the rights of the parties to have been different from what they at the time supposed. The real consideration which each party receives under such a compromise is, according to some authorities, not the sacrifice of the right, but the settlement of the dispute." 8 Cyc. 505 *et seq.*

Cited with approval in *Hutchinson v. Mt. Vernon Water & Power Co.*, 49 Wash. 469, 95 Pac. 1023. See, also, *Snohomish River Boom Co. v. Great Northern R. Co.*, 57 Wash. 693, 107 Pac. 848.

"Anything of detriment on the one side, or of benefit on the other, may afford a consideration for a compromise. So, a compromise agreement may be supported by an agreement to perform some act which the promisor is not legally bound to perform, the mutual undertakings of the parties for the benefit of each other, the mutual promises of others similarly situated, the surrender of a lease, the payment of a note before due, or the forbearance of a legal right, such as the right to sue on a disputed or doubtful claim or an agreement not to appeal from a judgment, if the right of appeal exists or there are sufficient grounds for belief in its existence." 15 C. J. S. Compromise and Settlement, § 9, p. 725.

The trial court was entirely correct in holding that each party received a consideration for the settlement.

Another reason for affirming the trial court was that Allarbe after the settlement took all of the sheep and equipment of the company and continued in control until the end of the 1934 season.

I call attention to a few of his actions during that period of time: He stated that the sheep were his; he was boss of the sheep and was glad to have them back and felt satisfied he would make some money on them and was going to get more sheep and have McGuffie operate them for him. He gave orders to herders. He conferred with McGuffie on money matters concerning the company's affairs, talked with Allen and McGuffie about getting more sheep, and visited the herds at least once every week. He never expressed dissatisfaction over the settlement. He replaced two herders with Spaniards from California. He instructed McGuffie to wire Bolin in Oregon about buying more sheep. He stated that he was going to take Allen and Bolin in business with him. He went to Chicago with one shipment of lambs. He laid plans to get new ranges for 1935 and appeared before the Indian council and made application for the Olney range for 1935. He borrowed money at two different times from the Wool Growers and signed a note thereof as president. In fact, he did everything that an owner or a manager would have done with his own sheep.

It is the law in this state that, if a person claiming fraud enters into new arrangements concerning a contract to which the fraud applies and retains the benefits thereof for a considerable length of time, he is deemed to have waived his claim for damages: *Virtue v. Stanley,* 87 Wash. 167, 151 Pac. 270; *Victor Products Corp. v. Edwards,* 172 Wash. 1, 18 P. (2d) 1045; *Keylon v. Inch,* 178 Wash. 522, 35 P. (2d) 73; *Bonded Adjustment Co. v. Anderson,* 186 Wash. 226, 57 P. (2d) 1046, 106 A. L. R. 166.

Other states adhere to the same rule: *Schmidt v. Mesmer,* 116 Cal. 267, 48 Pac. 54; *Burne v. Lee,* 156 Cal.

221, 104 Pac. 438 (both quoted from in the *Keylon* case).

I have shown that Allarbe settled his differences with Ragan and Dunnett, took full ownership and possession of the sheep business, and conducted that business for many months. After so doing, he should be estopped from denying the agreement of settlement into which he freely entered.

The real reason Allarbe sought to recover in this case was that he lost money during the season following the settlement. The loss of money was occasioned, not by anything that any individual did in this case, but by the business depression. This is shown by the testimony of Archie Prior, who had been in the sheep business for thirty-eight years. He stated:

"Well, I would say the prices started down in '30. I didn't notice it so much, but did begin to notice it in '31, and kept on going down until '34, because '34 I think was the worst year, the poorest year I ever had . . ." and that in 1934, "I operated at a loss."

Even the business ability exhibited by Allarbe in building a fortune of $50,000 could not overcome the hard times of 1934. Finding that he had made a bad bargain, his native shrewdness and exceptional business judgment impelled him to rely upon his supposed ignorance to recoup his lost fortune from Ragan and Dunnett by charging fraud in the settlement of his controversy with them.

The judgment of the trial court was correct, and the judgment should be affirmed.

MILLARD, J. (dissenting)—The rule that, when the language of a statute is free from ambiguity, there is no room for construction, was stressed in *Spokane v. State*, 198 Wash. 682, 691, 89 P. (2d) 826.

Rem. Rev. Stat., § 368 [P. C. § 8487] (the validity of this statute is not challenged and its language is unambiguous), provides that the findings of a trial court upon the facts shall be deemed a verdict and may be

set aside in the same manner and for the same reason as far as applicable. That is, the findings of the court upon the facts are deemed a verdict, and, if supported by competent evidence, must be sustained on appeal.

It is not a sound rule that, where the clear weight of the evidence is with either side, there is no substantial conflict and we should disregard the verdict of a jury or the findings of a trial court. The correct rule, once respected by appellate courts and in harmony with the rule (Rem. Rev. Stat., § 368) the legislature enjoins us to observe, is that a judgment founded on the verdict of a jury, or a judgment based on the findings of a trial court, will not be reversed where there is substantial conflict in the evidence, merely because we are of the opinion that the weight of the evidence is contrary to the verdict or to the findings. It is unnecessary to cite the many opinions in which this court has stated that a trial judge is always much better able to determine the weight and credibility of witnesses than we.

Implicit in the oath (to which a judge of this court subscribes before entering upon the duties of his office) that he will support the constitution of this state, is the judge's pledge that he will support the valid enactments (concededly Rem. Rev. Stat., § 368, is valid) of the legislature.

I cannot concur in the so-called majority opinion (I say this with all deference to those composing a majority of a quorum of this court), as such utter disregard of the rule—judicial and statutory—would not comport with my oath of office.

In *Newton v. Pacific Highway Transport Co., ante* p. 507, the superior courts are admonished to follow the opinions of this court. We may anticipate the apropos retort by the superior court judges that man is taught that wisdom does not manifest itself so much in precept as in example; that is, our actions and words

should be all of a color. *Le sermon edifie, et l'example detruit.*

We greatly respect, as we should, the principle of *stare decisis.* Our record discloses that, however reluctant we are to depart from former decisions, we will not yield to them if by yielding we perpetuate error. From 1854 to 1942, inclusive,—a period of 89 years—we challenged and/or overruled not less than 602 of our opinions. From 1937 to 1942, inclusive,—a period of six years—we challenged and/or overruled 142 opinions or twenty-three and one-half per centum of the total of 602 for 89 years.

Art. IV, § 3, of our state constitution, provides that the term of judges of this court shall be six years, and that, if a vacancy occur in the office of a judge of this court, the governor shall appoint a person to hold the office until the election and qualification of a judge to fill the vacancy; and the judge so elected shall hold the office for the remainder of the unexpired term. That is to say, when a judge is elected and qualifies for the term of six years he holds the office for that term of six years, unless he dies, resigns, or is removed by impeachment prior to the expiration of that term.

Art. IV, § 2, of the state constitution, provides that the legislature may increase the number of judges of the supreme court from time to time; but there is no constitutional provision under which the legislature is empowered, in the event it increases the number of judges, to make less than a majority of the judges a constitutional majority of the court; neither is there any authority for proxy voting.

Art. IV, § 8, of the state constitution, authorizes the governor in cases of extreme necessity to grant permission to judicial officers to absent themselves from the state for more than sixty consecutive days. Nevertheless, the judge is a member of this court while so absent.

Laws of 1941, chapter 201, p. 592, authorizes judges

to be absent from this state for such period as they are in the active service of the United States. The statute further provides that during such leave of absence the judicial position may be filled temporarily by appointment.

By the constitution (Art. IV, § 2), the legislature is authorized to increase the number of judges from time to time, but the legislature may not make the term less or more than that prescribed by the constitution. Nor may the legislature authorize the filling temporarily by appointment of the position of supreme court judge during the period the judge is on leave of absence from the state or absent sick within this state. Each of nine judges of this court was elected, and qualified, for a term of six years. In plain understandable language, the constitution prescribes the limits of the term of office of a judge of this court, which cannot be increased during that term, nor may that term be lessened except by death, resignation, or legislative removal of the incumbent through impeachment proceedings. During his term of office, I reiterate, that judge must be counted in determining what is a constitutional majority of this court.

This cause was heard by the court *En Banc,* with the then nine judges sitting. Subsequently, one of those judges was granted permission under Art. IV, § 8, of the constitution, to absent himself from the state for more than sixty consecutive days. Pursuant to the provisions of Laws of 1941, chapter 201, the judicial position was filled temporarily by appointment. Another of the judges who heard the cause died in the fall of 1942. His successor was elected and duly qualified. In other words, if we concede the constitutionality of Laws of 1941, chapter 201, we have ten judges on this court.

Seven of the nine judges who heard the cause are present and may function. The judge absent from the state cannot participate, but he is none the less a mem-

ber of this court and must be counted in ascertaining what is a constitutional majority of this court. The successor to the deceased judge and the temporary judge cannot function until they hear the cause. If after that hearing, there is an absence of a constitutional majority (six judges) to reverse the judgment, the same must be affirmed.

In *Edwards v. Carroll*, 163 Wash. 704, 300 Pac. 1048, we dismissed the action of Mayor Edwards for injunctive relief for the reason that Judge Fullerton was incapacitated at his home in Olympia on account of illness, and, as the eight remaining judges were divided in their opinions and there was no majority either for affirmance or for reversal, we affirmed the judgment of the trial court. See, also, *Clise v. Carroll*, 163 Wash. 704, 300 Pac. 1047. A similar situation was presented in *Culliton v. Chase*, 173 Wash. 309, 22 P. (2d) 1049, 174 Wash. 363, 25 P. (2d) 81.

If members of this court do not participate in the hearing of a cause because disqualified, absent from the state, or incapacitated by illness, a majority of the judges who participate in the hearing cannot reverse the judgment unless that is a constitutional majority, or a majority of all of the judges who are members of this court. In *State ex rel. McAulay v. Reeves*, 196 Wash. 1, 81 P. (2d) 860, two of the nine judges did not participate in the hearing of the cause. Four judges voted for the so-called majority opinion. Three judges dissented. The rule was invoked that the one upon whom is imposed the burden of sustaining the affirmative in this court cannot be granted relief in the absence of a constitutional majority on either side of the question presented. Upon rehearing, the judge who insisted that *State ex rel. Chealander v. Carroll*, 57 Wash. 202, 106 Pac. 748, should be overruled, and contended that there was an absence of a constitutional majority on either side of the question presented, concurred in the opinion of the four judges who, on the rehearing, con-

cluded that *State ex rel. Chealander v. Carroll, supra,* should be overruled. The first opinion, thus modified, was adopted as the opinion of the court, five judges (a then constitutional majority) voting therefor, two judges dissenting, two judges not participating.

I concur in the opinion of Simpson, C. J. The judgment should be affirmed.

### On Petition for Rehearing.

[*En Banc.* October 6, 1943.]

Per Curiam.—The respondents in the foregoing cause have timely filed a petition praying for a rehearing *En Banc* or, in the alternative and in case a rehearing should be denied, for a clarification of the opinion pronounced thereon on August 11, 1943, *ante* p. 655. The gist of the argument in support of the alternative prayer of the petition is as follows:

"We submit that anything which may be interpreted as a finding by the Supreme Court as to the status of any item of the accounting which must be had between the parties is improper. This court has decided that an accounting must be had, and the lower court should be free to hear evidence from both sides as to each and every item which will enter into that accounting, and both sides should be left free to introduce all appropriate evidence which will bear upon the individual items thereof. It must be remembered that the respondents have not put in any evidence, or at least all of their evidence, relating to some of the matters above set forth, nor as to the demand for accounting, and they should not be put in a position upon the re-trial of being foreclosed from showing all the facts relative to the above matters because the court has mentioned them in its opinion as if it were deciding them, and thereby closing the door to any futher investigation of them. . . .

"We submit that the true situation is that, it having been decided that an accounting must be had, we are right back to where we were when the case came on for trial in the lower court the first time, and respondents should be permitted to make their accounting,

unhampered by any findings of fact or determinations from this court which have been made upon the partial evidence before this court for review. In other words, the lower court denied cross-complainants the right to an accounting, this court has reversed that decision and held that cross-complainants are entitled to an accounting, and now respondents should be permitted to make it without any element of res judicata entering into the making thereof."

A majority of the court is of the opinion that a rehearing should be denied but that the alternative prayer of the petition should be granted. Accordingly, it is ordered:

(1) That the petition of the respondents for a rehearing *En Banc* be and is hereby denied;

(2) That the trial court be directed that, in taking the account ordered, no specific item thereof shall be treated as having been allowed or disallowed by this court, nor shall it be deemed that this court has made any final decision as to the validity of any mortgage debt involved or any final determination of the amount, if any, due or owing thereon.

SIMPSON, C. J. (dissenting) — I dissent upon two grounds:

First, the majority makes a very definite change in the original opinion and this is based solely upon the petition of the respondents. If the court has in mind to consider the petition to modify or clarify the majority opinion, it should only do so after opposing counsel have had opportunity to be heard. It may be that counsel for appellants have definite and well-founded reasons for objections to the modification or change in the original majority opinion.

My second reason is that the majority, when they held respondents liable, decided that certain amounts were advanced by Allarbe and Ragan & Dunnett and improperly used by them. Typical of the holdings are:

"On November 13, 1930, Ragan & Dunnett gave Wool Growers a check for $25,000, marked 'Kays' sheep.'

This was not the money given them by Allarbe. That money had already been spent. This money was part of a loan of $35,000 obtained from the First National Bank of Yakima, or National Bank of Commerce, which $35,000 was deposited in their bank account on November 13, 1930."

"And on December 3, 1930, it issued its·check for $17,102.89, in favor of Simcoe Sheep Company, . . ."

"The balance in Ragan & Dunnett's bank account on December 3, 1930, immediately prior to the deposit of the $17,102.89 check, was $699.59. On December 5, 1930, Ragan & Dunnett used $13,500 of the $17,102.89 proceeds of the loan to Simcoe to pay an obligation owing by them to Guaranty Trust Company."

"Simcoe funds were used by Ragan and Wool Growers to pay this mortgage and the back range fees. On September 4, 1931, Wool Growers sent the bank a check for $10,296.99, the balance due on the Olney note held by the bank, and in November, 1931, used $2,462.91 of Simcoe funds to pay the balance due it from Olney."

"Concert of action grew and developed. Ragan's firm was in desperate need of cash. He acquired more than $42,000 of Allarbe's money. Needing further financing, he got it by bailing Wool Growers out of a couple of bad loans to Kays and Olney. This was of material benefit to both Wool Growers and Ragan. Wool Growers realized in full on a bad loan. Olney's $5,300 back range fees, for which Ragan and wife were sureties, were paid, and Ragan even kept the range. Allarbe's money made these things possible. In other transactions, Allarbe's money, and afterwards Simcoe funds and property, were, with the knowledge, and indeed with the assistance of Wool Growers, so commingled with the funds of Ragan & Dunnett that they cannot be segregated, at least under the evidence so far produced in this case. There appear to have been repeated misuses of corporate funds in which both Ragan & Dunnett and Wool Growers participated. For example, Ragan should have paid the back Olney range fees. They were discharged by the use of Simcoe's·money. Wool Growers paid obligations of Ragan & Dunnett to themselves with Simcoe money."

If the trial court is given the right mentioned in this *per curiam* opinion, it may disallow all of the items I have mentioned, which would result in the elimination of the very basis of the majority opinion and render it of no effect.

MILLARD, J., concurs with SIMPSON, C. J.

